UNITED STATES, Appellee

v

CHARLES PLANTER, Private First Class,
U. S. Army, Appellant

18 USCMA 469, 40 CMR 181

No. 21,901

August 8, 1969

*Captain Thomas R. Maher* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Charles W. Shiesser,* and *Major Dennis R. Hunt.*

*Captain Edwin L. Gage* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major Edwin P. Wasinger.*

## Opinion of the Court

FERGUSON, Judge:

Although the accused was convicted of a number of offenses, we are concerned, in this opinion, only with the court-martial's finding of guilty under the Charge, one specification each of larceny of Government property, and wrongful appropriation of a Government truck, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. His sentence, as finally approved, extends to a dishonorable discharge, total forfeitures, confinement at hard labor for four years, and reduction to Private E-1. We granted review on the two following issues:

1. Whether the law officer erred to the substantial prejudice of appellant by admitting appellant's pretrial statements into evidence.

2. Whether the law officer erred in admitting evidence of accomplice Wheeler's conviction by special court-martial of this same offense.

The first granted issue does not concern the quality of the warning as to his right to silence and to counsel, given to the accused, by his interrogators, but rather the manner in which the interviews were conducted. When apprehended at about noon on the day in question, the accused, according to the witness, an agent of the Criminal Investigations Detachment, was informed that he was suspected of the theft of a number of Government generators and warned of his right to silence and his right to counsel. At that time he allegedly was informed that he would not then be interviewed and no statement was desired. The accused remained silent. About five hours later another CID agent again informed the accused of his rights and attempted to interview

him concerning the theft of the generators. The accused specifically denied any knowledge thereof. Aware of the negative results of this interview, the first agent, believing the accused had been untruthful and feeling that he could get an admission from him, undertook to interview the accused. Following a renewal of the earlier warning, the agent's testimony, in pertinent part, is as follows:

"I began my interview by informing Private Planter that his denial to Mr. Seago was an outright lie. I informed Private Planter that I was convinced that he had taken these generators; nothing he could say would make me believe otherwise. I felt it was the lowest action that a man could take to steal from the Government—not only to steal from the Government, but to steal supplies which go to our troops. I approached instances in the past where we had recovered property going to troops in the field from the Vietnamese for which military men were responsible for the property falling into the hands of the Vietnamese. I—you might say that I attempted to degrade Planter, and at one point Planter became quite angry.

. . . . . .

"Planter, at that time, made a statement to the effect that he was angry and that he would fight with me if he had the opportunity.

. . . . . .

"At that time, I was pushing Planter towards an emotional state. I was telling him that this type activity, of which he was suspected, and of which I was firmly convinced he was involved in, was of the lowest caliber action that any of our

470

troops could do in this war. And, I achieved what I started out to do.

. . . . . .

"*Questions by DC:*

"Q. Aside from the one ejaculation by Planter to the effect that he wanted to fight you, if he had the opportunity, did he participate in any other way, by either dialogue or monologue, until he made the allegedly self-incriminating statements?

"A. He attempted to, but I overruled him with my voice.

"Q. He attempted to say something?

"A. Yes.

"Q. What did he attempt to say?

"A. I have no idea what he attempted to say.

"Q. You didn't allow him to say anything for about fifteen minutes, other than the one ejaculation that he wanted to fight if he had the opportunity.

"A. Right."

The agent also testified that the accused initially denied involvement in the offense; there was no one in the room with them; and that during the first half of the interview he "was speaking in a loud tone of voice. The other investigators, who were in other portions of the office, could have heard me." The second half was calm. According to the witness, the accused asked for counsel immediately after making the alleged incriminating statements and expressed a desire to terminate the interview.

The law officer overruled defense counsel's objection to the admission of these statements. We believe that the law officer erred therein.

A statement obtained as the result of coercive tactics is, *per se*, involun- Paragraph 140*a*, **Headnote** ██ Manual for Courts-Martial, United States, 1951. ██ United States v Tanner, 14 USCMA 447, 34 CMR 227; United

States v Askew, 14 USCMA 257, 34 CMR 37; United States v Houston, 15 USCMA 239, 35 CMR 211. Cf. Spano v New York, 360 US 315, 3 L Ed 2d 1265, 79 S Ct 1202 (1959); United States v Traweek, 16 USCMA 50, 36 CMR 206. Coercion can be mental as well as physical. As stated by the Supreme Court in Miranda v Arizona, 384 US 436, 448, 16 L Ed 2d 694, 708, 86 S Ct 1602 (1966):

". . . [T]he modern practice of in custody interrogation is psychologically rather than physically oriented. As we have stated before, 'Since Chambers v Florida, 309 US 227 [84 L Ed 716, 60 S Ct 472], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v Alabama, 361 US 199, 206, 4 L Ed 2d 242, 247, 80 S Ct 274 (1960)."

The military investigator, in this case, was quite candid in his recitation of the manner in which he "achieved what I started out to do." While the record is cold, a certain pride of workmanship is evidenced in his straightforward exposition of the tactics used. When defense counsel referred to his admittedly verbal assault upon the accused as being "like the great first symphony. . . . With the first movement, crescendo, and the final movement, decrescendo," he simply replied "absolutely." With regard to the accused's offer to fight him then and there, the investigator testified that "he would have been a fool to do it." We are uncertain of his meaning but it is not unreasonable to conclude that had the accused followed up his offer he would have been chargeable, under Article 91, Code, supra, 10 USC § 891, for the offense of assaulting a noncommissioned officer in the execution of his office.[1]

_____

[1] The investigator was a warrant officer.

We think that the method used by the investigator was patently coercive and that the statements ▆▆▆▆ ▆ were thereby involuntary. The law officer erred by not so recognizing the situation. See Jackson v Denno, 378 US 368, 12 L Ed 2d 908, 84 S Ct 1774, 1 ALR3d 1205 (1964). Cf. United States v Mewborn, 17 USCMA 431, 38 CMR 229.

The approach was not even subtle. It consisted of a seven to fifteen minute solo tirade against the accused, delivered "in a loud tone of voice" which could be heard "in other portions of the office." The purpose was related by the witness as the "ultimate goal" of all interviews by a criminal investigator—"a confession or an opinion." The tactics utilized were admittedly designed to push the accused "towards an emotional state,"[2] by attempting to "degrade" him. It can hardly be contended that a statement made in such circumstances is voluntary. It is inescapably clear that the Fifth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." Blackburn v Alabama, 361 US 199, 206–207, 4 L Ed 2d 242, 248, 80 S Ct 274 (1960). As stated in Spano v New York, supra:

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." [Ibid., 360 US, at 320–321.]

There is another and equally important matter for concern here. When the accused attempted to speak during the investigator's oration, the latter testified, "I overruled him with my voice. . . . I have no idea what he attempted to say." For all we know the accused may have been attempting to again deny complicity and, as he later did, to terminate this flow of words by a request for counsel. The Staff Judge Advocate, in his review, at page nine, conceded this possibility. Had he been allowed the common courtesy of speech at that time, the statements admitted in evidence might never have been uttered. The investigator, however, was not ready to listen to the accused. He had not yet reduced the accused to the emotional level he believed necessary to achieve his purpose. This, too, is an element of the coercion we find in this case.

As the Supreme Court said in Miranda v Arizona, supra:

". . . If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes the privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in

---

[2] The witness testified that he believed the accused was "more belligerent" than the normal suspect. Evidence of his low emotional tolerance is apparent from the fact that when he was ordered into pretrial confinement some two months later he resisted arrest, as a result of which he was charged with the other offenses, growing out of this incident, of which he now stands convicted (two specifications each under Articles 90 and 128, Code, supra, 10 USC §§ 890 and 928, and one specification each under Articles 80 and 134, Code, supra, 10 USC §§ 880 and 934).

472

producing a statement after the privilege has been once invoked." [*Ibid.*, 384 US, at 473–474.]

The coercive tactics used in this case, while objectionable in the civilian community, are especially overpowering in a military setting. As the late Judge Kilday, writing in United States v Smith, 13 USCMA 105, 120, 32 CMR 105, said:

". . . many of those in the military are now serving by reason of compulsory laws; many are away from home, family, and friends for the first time; and many are of an age making them responsible in some jurisdictions only as juveniles. Further, military personnel to whom confessions are made are, in many instances, of higher rank than the one confessing, and certainly, if only by reason of their duties, tend to have great influence under the circumstances."

The "totality of the circumstances" (Gallegos v Colorado, 370 US 49, 55, 8 L Ed 2d 325, 329, 82 S Ct 1209, 87 ALR2d 614 (1962)) under which these statements were obtained bespeaks a reflexive, coerced outburst rather than a voluntary disclosure. We are constrained, therefore, to hold that the law officer erred to the substantial prejudice of the accused by admitting his pretrial statements into evidence. Paragraph 140a, Manual, supra, and cases cited above. Reversal is required.

The second granted issue need not detain us. A Government witness, Wheeler, testified that he was an accomplice of the accused in the theft of the generators and the wrongful appropriation of the Government truck utilized to transport the stolen articles to their ultimate destination. During his questioning of the witness, trial counsel elicited the fact that the former had been convicted by special court-martial for his part in the affair. He also argued before the court that the accomplice should be believed "because he was there."

Evidence that a co-actor was convicted on a separate trial is not admissible on the issue of ▆ guilt of another accused. Paragraph 140b, Manual, supra; United States v Humble, 11 USCMA 38, 28 CMR 262; United States v Domenech, 18 USCMA 314, 40 CMR 26. The question of prejudice, however, must be judged from the standpoint of whether the error played a part in the court-martial verdict. United States v Humble, supra. In this case, we need not decide the issue for it should not reoccur on rehearing.

The decision of the board of review with regard to the findings of guilty of the Charge is reversed. The record of trial is returned to the Judge Advocate General of the Army. A board of review may reassess the sentence on the remaining findings of guilty or a rehearing on the Charge may be ordered.

Judge DARDEN concurs.

QUINN, Chief Judge (dissenting):

The problem raised by the defense objection to the pretrial statement was presented only to the law officer in an out-of-court hearing. Later, the law officer called defense counsel's attention to the difference between the evidence in that hearing and the evidence presented in open court and advised counsel that, on that basis, "only . . . [his] ruling . . . will be in issue." In response, defense counsel indicated it had been his "specific purpose" to so limit the issue. As a result, the question before us is whether the law officer's ruling was correct as determined by a "preponderance of the evidence," not as determined beyond a reasonable doubt by the court-martial. United States v Mewborn, 17 USCMA 431, 436, 38 CMR 229.

As I read the record, the law officer had the following matters to consider:

(1) At the outset of the interview, the accused was fully informed of his right to remain silent and the right to counsel and was asked if he wanted counsel. He said he did not.

**473**

(2) At the beginning of the interview, the accused was also asked if he wanted to talk about the matter, and he answered, "yeah, I didn't do it."

(3) The agent testified he asked no questions in the first part of the interview.

(4) At one point in the agent's discourse on the consequences to the Army of larceny-type offenses, the accused became belligerent and evinced a desire to fight the agent. The majority construe this incident only in light of the agent's trial comment as to the foolishness of the accused's desire to fight. I view it differently; and I think the law officer viewed it differently. As I construe the incident, it provides a reasonable basis for the conclusion that, notwithstanding the agent's tactics, the accused could, and did, effectively and consciously choose between silence and other action.

(5) The statement itself, which is nowhere mentioned in the majority opinion, is virtually a denial. Except for a difference in words, it is essentially a reiteration of what the accused said at the beginning of the interview. Here, he said:

"'I didn't load them on the truck, I didn't drive the truck, but I'm sorry'"; at the beginning he said "I didn't do it." Immediately after the statement, the accused requested counsel, and the interview was terminated.

Unquestionably, the record demonstrates the accused was informed of, and fully understood, his right to remain silent and to have counsel. In my opinion, the record equally demonstrates support for the law officer's conclusion that the accused was willing to listen to the agent's views about the matter and was not influenced by the agent's tactics to surrender his rights.[1] I would, therefore, sustain the law officer's ruling. United States v Alaniz, 9 USCMA 533, 26 CMR 313.

So far as the evidence of the accomplice's conviction is concerned, I perceive no prejudice to the accused in the circumstances of the case. United States v Nix, 11 USCMA 691, 29 CMR 507. See also United States v Domenech, 18 USCMA 314, 40 CMR 26.

I would affirm the decision of the board of review.

---

[1] Later in the trial, the law officer informed counsel that he regarded the accused's statement as constituting a denial. For that reason he proposed to reverse his original ruling and to instruct the court members to disregard the statement. However, when defense counsel indicated he would move for a mistrial, he decided to adhere to his previous ruling.