UNITED STATES, Appellee

v

JOSEPH B. ATTARDI, Staff Sergeant,
U. S. Army, Appellant

20 USCMA 548, 43 CMR 388

No. 23,568

May 14, 1971

*Captain Bernard J. Casey* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr.,* and *Captain Thomas R. Maher.*

*Captain Gordon F. Bailey, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain John C. Lenahan,* and *Captain Benjamin G. Porter.*

## Opinion of the Court

DARDEN, Judge:

Despite the appellant's pleas of not guilty, a general court-martial found him guilty of violating a general regulation by reproducing and delivering a classified document to a person not authorized to receive it, charged under Article 92, Uniform Code of Military Justice, 10 USC § 892, and of willfully delivering a document relating to the national defense, an offense charged under Article 134, Uniform Code of Military Justice, 10 USC § 934. After the Army Court of Military Review dismissed the charge resulting from violation of a general regulation, it affirmed a sentence of dishonorable discharge, total forfeitures, and confinement at hard labor for two years as a result of its affirmance of the charge alleging a violation of Article 134.

The first of several issues on which the Court granted review has to do with the voluntariness of a pretrial confession by the appellant. Beginning at about 11 p.m. on April 11, 1969, seven or eight military intelligence special agents questioned the appellant at least four times between about 11 p.m. and about 5 a.m. the next morning, when he made the confession.

In both an out-of-court hearing and in open court the trial defense counsel moved to suppress the appellant's confession. The law officer denied the motion and admitted it. The Government prosecuted the appellant through the testimony of a Specialist Five Pinkston and the appellant's confession, the text of which is:

"On 26 March 1969, I was approached by William Pinkston, who asked me to get him some classified documents. Pinkston said he could sell them to unknown persons and would give me some money. At this time, I was under some pressure and needed the money. On or about 28 March 1969 I took a COSMIC TOP SECRET document, copy number 12, made a reproduced copy of it and took this reproduced copy to my quarters. On or about 2300 hours, 28 March 1969, in my room, I gave Pinkston an envelope with the document inside. Pinkston said 'Fine. I know the people to give this to. Don't worry, my CID friends will protect you.'"

The record is replete with contradictions about the understanding Sergeant Attardi had when he confessed. His version is that he confessed because he thought he was cooperating with military intelligence agents who were trying to prevent a compromise of classified information. According to Sergeant Attardi, one of the agents interrogating him referred both before and after his confession to its remaining in intelligence channels. In contrast, the deposition of this agent, who did not testify in person because he was on the way to Vietnam at the time of the trial, is as follows:

"A Well, I don't know if I said that during the interrogation, whether it would stay in intelligence channels. If I recall correctly, his question was, 'What's going to happen with this?' I said that right now, as far as I knew, it stays in intelligence channels. It'll be up to higher headquarters what they want to do with it.

. . . . .

"A I informed Sergeant Attardi that when he asked what's going to

happen, this will, as far as I know, stay in intelligence channels until higher headquarters decides what it wants to do with it. I informed him that we are a fact finding outfit and that we just forward our reports through channels. Whatever happens to them is out of our hands."

The triers of fact could have regarded the question "What's going to happen with this?" as an indication that the confession had been made before Sergeant Attardi asked what would happen to it.

Regardless of the timing of the references to the confession's remaining in intelligence files, the appellant acknowledged in his testimony that Agent Schmitt had informed him the decision was not his to make but would be made by a higher headquarters. These are the appellant's words on this subject:

## "QUESTIONS BY THE PROSECUTION:

"Q I believe you stated that Mr. Schmitt—. Did a Mr. Schmitt promise you that anything you said would be kept strictly in military intelligence channels?

"A He stated it would be held in military intelligence files.

"Q Did he promise you this statement would only be used for military intelligence purposes?

"A Special Agent Schmitt said as far as he knew it would be in military intelligence channels only.

"Q As far as he knew?
"A As far as he knew.

"Q Did he indicate that the decision was not his to make?

"A Yes, sir, he said he would have to co-ordinate with higher headquarters.

"Q Did he say that higher headquarters would have the final say so as to what would be done with the statement?
"A Yes, sir."

Further contradictions occurred over the warnings given Sergeant Attardi in compliance with Article 31, Uniform Code of Military Justice, 10 USC § 831, and with this Court's decision in United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967). In their testimony, the interrogating agents said that at four different times during the evening they gave full warnings, including notice that any statement Sergeant Attardi made could be used against him in a criminal trial. The signed confession also acknowledges receipt of the warnings. Sergeant Attardi's testimony agreed that he received advice of his rights under Article 31 "Every time the interrogating teams came in" and that this advice was given to him "From the book . . . Uniform Code of Military Justice from the Manual." But he also contended that his Article 31 warnings did not include advice that any statement he made could be used against him in a criminal proceeding.

This is a typical example of a case in which the conflict in testimony is one for determination by court members after they were instructed that in order to consider the statement they must find beyond a reasonable doubt that it was voluntary. The instruction on this topic is unexceptionable.

On appeal, defense counsel press another attack against the voluntariness of the confession that was not suggested at trial. This is that at one point the appellant indicated he did not want to make a statement. If this answer constituted an indication Sergeant Attardi did not want to respond to questions, the confession was involuntary and inadmissible. United States v Bollons, 17 USCMA 253, 38 CMR 51 (1967); United States v Attebury, 18 USCMA 531, 40 CMR 243 (1969).

A prosecution witness testified about the questions and answers involved in this contention as follows:

"Q Did you ask him if he wanted to make a statement?
"A I don't believe I did. I believe Mr. Schmitt asked him.

"Q Do you know what Sergeant Attardi's reply to this was?

"A At that moment, he did not want to make a statement.

"Q At that time, did he say, 'I do not want to make a statement'?

"A He really didn't give any indication—he just shook his head.

"Q Were any questions asked of Sergeant Attardi?

"A Mr. Schmitt may have asked him a few questions, the exact questions I do not want to recall.

"Q Did he indicate he didn't want to make a statement?

"A He asked to see the man in the blue sweater again.

"Q Who was that?

"A Mr. Rohlfing.

"Q Who was Mr. Rohlfing?

"A One of the other people who worked in our field office."

The exchange quoted above occurred several hours after the appellant was first questioned and after ▆▆▆▆ ▆ he had had the required warnings. As the Government views this testimony it is only an indication the appellant did not desire to make a statement until one particular agent, Mr. Rohlfing, was present. Such an interpretation of the testimony is also consistent with the appellant's trial testimony that he had freely and voluntarily made the incriminating statement because he was cooperating with military intelligence agents who were trying to prevent a compromise of classified information. After considering the timing and circumstances of the exchange quoted above we decline to hold as a matter of law that Sergeant Attardi's response indicated he desired to remain silent. We therefore regard the appellate issue on this point as being without merit.

Trial defense counsel suggested other grounds for finding the confession was involuntary. These grounds were that improper questioning occurred about whether Sergeant Attardi's wife was having an illicit relationship with a Navy officer and that Sergeant Attardi's will was overborne as a result of the prolonged questioning. The law officer ruled that the evidence before the court was not enough to warrant an instruction on these two contentions but, as indicated above, he did instruct on whether there had been an unlawful inducement in the form of assurances the confession would remain in intelligence files.

Regarding Sergeant Attardi's wife, he testified that one of the agents made a statement to the effect that his wife was pregnant by a Navy captain. Although Sergeant Attardi thought this information came from a letter contained in the manila envelope he delivered to Pinkston, it could have come from Specialist Pinkston, whose pretrial statement disclosed that Sergeant Attardi had shown him a letter his wife had written to a Navy lieutenant but had mailed to him by mistake. According to Specialist Pinkston, the letter indicated the naval officer had fathered a baby by Mrs. Attardi.

Sergeant Attardi testified on this point in this way:

"A Special Agent Gunther got very very upset at my answers. He said to me, 'Isn't it a fact your wife is pregnant by a Navy captain?' and that is where I did get hot under the collar, but not enough to get upset.

. . . . .

"A Specialist Gunther was interrogating me, along with Special Agent Rohlfing, and he was doing most of the interrogating. I was answering his questions. It seemed he didn't appreciate my answers, so he then went outside and came back and said, 'Isn't it a fact your wife is pregnant by a Navy captain?' I said, 'No.' He asked me, 'How could you be sure?' My answer was, 'She had a miscarriage in February.' There was no possible way where I got upset."

Similarly, Sergeant Attardi's testimony weakened trial defense contentions about prolonged questioning:

552

"Q Were you given an opportunity to sleep?

"A No. I was asked if I wanted to sleep; I declined.

"Q Why did you decline?

"A I was given the opinion this being a fact-finding organization, and I would like to get it over with and be released."

We find no error in the law officer's refusal to instruct that the reference to Mrs. Attardi or the lateness of the questioning created an issue of voluntariness.

A second error appellate defense counsel assign is that the law officer should have instructed the court it must find the appellant knew that Pinkston, the person to whom he delivered the classified document, was not authorized to receive it.

The law officer gave these instructions on the elements of the offense:

"Turning now to Charge II and its Specification: In order to find the accused guilty of the Specification of Charge II and Charge II, you must be satisfied by legal and competent evidence beyond a reasonable doubt as follows:

"1. That the accused lawfully had access to a certain document;

"2. That said document related to the national defense;

"3. That the accused had reason to believe said document could be used to the injury of the United States or to the advantage of any foreign nation;

"4. That on or about 28 March 1969, at Heidelberg, Germany, the accused willfully delivered a copy of said document to Specialist Five William T. Pinkston;

"5. That the said Specialist Pinkston was a person not entitled to receive said copy; and

"6. That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces."

Although the specification and the charge make no express reference to section 793(d) of Title 18, United States Code, the parties to the trial conceded that the offense was based on that subsection. Relying on Gorin v United States, 312 US 19, 85 L Ed 488, 61 S Ct 429 (1941), appellate defense counsel contend that a necessary element of the offense involved is that the appellant knew Pinkston was not entitled to receive the classified document. A corollary of this argument is that the preemption doctrine enunciated in United States v Norris, 2 USCMA 236, 8 CMR 36 (1953), prevents the use of Article 134, Uniform Code of Military Justice, 10 USC § 934, to prosecute an offense defined by Title 18, United States Code, unless all elements of the Title 18 offense are alleged and proved. Our disposition of this assignment makes a decision on such contention unnecessary in the present case.

The Government asserts that, in combination, instructions requiring a finding that the document could be used to the injury of the United States or to the advantage of any foreign nation, a finding that Specialist Pinkston was not entitled to the document, and a finding that the appellant willfully delivered the document to Specialist Pinkston necessarily comprehend, under the instruction-as-a-whole test, a finding that the appellant knew Specialist Pinkston was not entitled to the classified document. Beyond such a contention, the Government maintains that in Gorin v United States, supra, at page 21, footnote 1, the Supreme Court dealt with sections of the Espionage Act of 1917, sections 1(b) and 2(a), expressly requiring an "intent or reason to believe," while section 1(d), of which section 793(d) of Title 18, United States Code, is a codification, requires a finding of only willfulness.

Our reading of Gorin convinces us that the holding of that case has no

**553**

application to a prosecution under section 793(d) of Title 18, United States Code, and is no authority that a prosecution under that section must show scienter or bad faith instead of only willfulness.[1] Consequently, we hold that the law officer's instructions on this point were adequate, even assuming, but not deciding, that all the elements of an offense under section 793(d) of Title 18, United States Code, must have been found to sustain a violation of that section charged under Article 134.

Appellant's third assignment of error is closely allied to the second one, supra. This assignment maintains that the evidence is insufficient to prove the appellant knew Pinkston was not entitled to receive the classified document appellant delivered to him.

The record reveals that Pinkston and the appellant met about one month before the night beginning on March 28, 1969, when the appellant delivered a manila envelope to Pinkston. Earlier when Pinkston was drunk and "Just blowing off my mouth, sir, just trying to show off," he had asked appellant if he could get plans for the M–16 rifle. The documents in the envelope appellant delivered to Pinkston remained in the latter's wall locker for two weeks before Pinkston turned them over to military intelligence, an agent of which found the envelope contained a document classified "Cosmic Top Secret." This is a classification not listed in the applicable security instruction, Army Regulation 380–5. Pinkston's testimony furnished nothing to indicate the appellant knew Pinkston was not entitled to receive the documents. According to appellate defense counsel, this is additional evidence that all parties at the trial erroneously assumed the element of appellant's knowledge that Pinkston

was an unauthorized recipient need not be proved. We find, however, that the evidence on this point is not insufficient as a matter of law. The appellant was an administrative clerk in the office of the Deputy Chief of Staff for Operations, Headquarters, United States Army, Europe and Seventh Army. He was accountable for top secret material retained in the division to which he was assigned. As a custodian of classified material, he was chargeable with knowledge of the applicable general regulation (USAREUR Regulation 380–5, paragraph 3d) which prohibited furnishing classified information without assuring that the recipient had a security clearance and a need-to-know. Pinkston never had a security clearance. Other circumstantial evidence from which court members could have inferred the necessary knowledge of Pinkston's lack of authorization to receive the document includes (1) the appellant's statement that he gave the document to Pinkston because he needed money, (2) his reproduction of the document instead of furnishing the original, and (3) his delivering the envelope late at night in personal quarters instead of in an office during duty hours. Accordingly, we hold that the evidence on this point was not insufficient as a matter of law.

The Court of Military Review dismissed specification 1 of Charge I, which alleged violation of a lawful general regulation by delivering to an unauthorized person a document that was classified "Cosmic Top Secret in the interest of national defense." In its opinion the Court of Military Review explained that the delivered document originated in an international military headquarters and that the classification "Cosmic Top Secret" is not necessarily confined to information about defense of the United States but could relate to defense informa-

---

[1] We need not consider whether a mistaken belief as to the right of the person to whom a national defense document is delivered may, under 18 USC § 793(d), be a proper defense.

See Dubin v United States, 289 F2d 651 (Ct Cl) (1961); 363 F2d 938 (Ct Cl) (1966), certiorari denied, 386 US 956, 18 L Ed 2d 103, 87 S Ct 1019 (1967).

tion of a nation allied with us. Since one incident led to both the dismissed charge and the remaining charge, and since the language of the specification of the two charges is similar, the appellant urges that the Court of Military Review also should have dismissed Charge II and its specification.

On the charge that was dismissed, the scope of the regulation concerned was limited to "U. S. Defense Information." The offense alleged in the remaining charge refers to a "document relating to the national defense." We agree with appellate Government counsel that these two terms are not necessarily coterminous and that "relating to the national defense" is a broader term than "U. S. Defense Information." A holding that classified information retained in a multinational headquarters in which the United States is a participant is not information "relating to the national defense" could constitute a judicial determination of a political question concerning whether collective security arrangements with other nations in Europe and elsewhere are related to the defense of the United States. "National defense . . . 'is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness.'" See Gorin v United States, supra, at page 28. We need not determine whether the Court of Military Review was correct in dismissing Charge I; we decide only that an ample basis exists for a finding that the delivered document was one "relating to the national defense."

The final assignment of error concerns the sufficiency of the evidence to prove beyond a reasonable doubt that the classified document related to the national defense. Discussion of the immediately preceding assignment largely applies to this one. The document was a letter from Headquarters, CENTAG, entitled "Letter of Instruction and Guidance Concerning Emergency Defense Planning." Stipulated testimony of a Colonel Robert G. Benckart, Deputy Chief, Operations Division, Office of the Deputy Chief of Staff, Operation, Headquarters, USAREUR and Seventh Army, gave his opinion that the document "contained information which could definitely be used to the advantage of a foreign nation and/or to the injury of the United States." The court was instructed that it must find beyond a reasonable doubt that the document related to the national defense. We conclude that the record was sufficient to permit them to make such a finding.

Since none of the assigned errors impresses us as meritorious, we affirm the decision of the Court of Military Review.

Chief Judge QUINN concurs.

FERGUSON, Senior Judge (dissenting):

I dissent.

The very techniques of interrogation condemned by the Supreme Court in Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966), as being destructive of an accused's free choice to silence are present in this case in abundance. The record reflects that: (1) The accused was interrogated by seven or eight (four teams of two each) military intelligence agents on at least four separate occasions during the hours 10:00 to 11:00 p.m., April 11, 1969, until he finally confessed sometime between 5:00 and 6:00 a.m., on the 12th; (2) despite his refusal at one point during the interrogation to make a statement, the questioning continued; (3) the " 'Mutt and Jeff' " act of one good and one bad agent was utilized with effective results—the accused finally requested to speak with the good agent and then confessed; (4) during a heated colloquy between the accused and the bad agent, the latter maliciously asked the accused if it was not " 'a fact your wife is pregnant by a Navy captain?' ";—the accused was forced to deny the *ultimate* truth of this degrading question by answering that " 'She had a miscarriage in February' "; (5) the accused was led to believe that the purpose of the inter-

rogation was to develop facts for intelligence purposes only and not with a view toward criminal prosecution by the statement of one of the agents that any statement he made would "stay in intelligence channels until higher headquarters decides what it wants to do with it."

In United States v Bollons, 17 USCMA 253, 257, 38 CMR 51 (1967), this Court unanimously reversed where the interrogation continued despite the accused's consistent refusal to answer when asked a question dealing directly with the offense under investigation. As we said in *Bollons*:

"... The picture that emerges from the record is that of an interrogation in which the agent blended seemingly innocent questions with broadly incriminating ones. The accused recognized the obvious import of the latter and refused to answer them, but it is apparent he either did not understand, or did not appreciate, the incriminating potential of the former. The pattern of his responses spells out a frustration of his effort to assert his right against self-incrimination during the interrogation. In a situation of this kind *Miranda* commands that the interrogation cease.

'Once warnings have been given, the subsequent procedure is clear. If the individual indicates in *any* manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.' (Emphasis supplied.) (Miranda v Arizona, supra, 384 US 436, 473–474.)"

See also United States v Attebury, 18 USCMA 531, 40 CMR 243 (1969), where we reversed on the basis of *Bollons*. In *Attebury,* the accused was interrogated three times in a four-day period by a Criminal Investigations Detachment agent. On the first occasion, he indicated a reluctance to speak about the alleged offenses and at the second interrogation he specifically refused to make any statement and the interview was terminated. At the third interview, after preliminary advice as to his right to remain silent and right to counsel, he engaged in conversation with the agent and this conversation led to an incriminating written statement. We held in *Attebury* that the "accused's repeated reliance upon his right to remain silent made it incumbent upon the agent to desist in his attempts to get the accused to talk." (*Ibid.*, at page 532.)

The " 'totality of the circumstances' (Gallegos v Colorado, 370 US 49, 55, 8 L Ed 2d 325, 329, 82 S Ct 1209, 87 ALR2d 614 (1962))" led to reversal in United States v Planter, 18 USCMA 469, 472, 473, 40 CMR 181 (1969), because Planter's confession had been obtained by the use of coercive tactics "designed to push the accused 'towards an emotional state,' by attempting to 'degrade' him." The following statement from *Planter* is especially pertinent to this case:

"The coercive tactics used in this case, while objectionable in the civilian community, are especially overpowering in a military setting. As the late Judge Kilday, writing in United States v Smith, 13 USCMA 105, 120, 32 CMR 105 [1962], said:

'... many of those in the military are now serving by reason of compulsory laws; many are away from home, family, and friends for the first time; and many are of an age making them responsible in some jurisdictions only as juveniles. Further, military personnel to whom confessions are made are, in many instances, of higher rank than the one confessing, and certainly, if only by reason of their duties, tend to have great influence under the circumstances.' " [*Ibid.*, at page 473.]

See United States v Traweek, 16 USCMA 50, 54, 36 CMR 206 (1966) for a cautionary comment relative to nighttime interrogations, as in this case, which could just as easily be postponed and conducted in the daylight hours.

In my opinion, the accused's pretrial statement, obtained under the above circumstances, was patently involuntary and its admission in evidence was prejudicially erroneous. Miranda v Arizona; United States v Bollons; United States v Attebury; and United States v Planter, all supra.

With relation to that issue which questions the correctness of the affirmance of the accused's conviction under Article 134, Uniform Code of Military Justice, 10 USC § 934, (Charge II), in light of the finding by the Court of Military Review that the specific document in question in specification 1, Charge I, did not relate to the national defense, I would hold that the court erred in its affirmance. There was only one document and only one act of transmitting that document by the accused to Specialist Pinkston. As the Court of Military Review, in discussing specification 1, Charge I, which alleged that the accused violated a regulation by transmitting the document to Pinkston, found:

". . . There is no evidence in the record that the document transmitted was in fact related to US defense information in spite of stipulated testimony to the effect that it could be used to the advantage of a foreign nation."

In Charge II it was alleged that the accused "having lawful access to *a document relating to the national defense,* which information . . . [the accused] had reason to believe could be used to the injury of the United States or to the advantage of any foreign nation," delivered a copy thereof to Pinkston. (Emphasis supplied.)

The two offenses obviously were multiplicious. United States v Posnick, 8 USCMA 201, 24 CMR 11 (1957). The reason for dismissal of the one applies equally as well to the other. I would reverse the decision of the Court of Military Review and order the Charge and its specification dismissed.