## UNITED STATES

v.

**Christopher J. BUBONICS, 298–64–7917, Airman (E–3), U.S. Navy.**

**NMCM 92 2014.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence adjudged 2 April 1992.

Decided 8 Aug. 1994.

---

Capt H.W. Frank, USMC, Appellate Defense Counsel.

Capt Laulie S. Powell, USMC, Appellate Government Counsel.

LCDR David B. Auclair, JAGC, USN, Appellate Government Counsel.

Before MOLLISON, Senior Judge, and WELCH and DeCICCO, JJ.

MOLLISON, Senior Judge:

The principal issue in this appeal from a special court-martial conviction is whether the appellant's pretrial confession should have been suppressed because it was obtained through the use of coercion, unlawful influence, or unlawful inducement. We conclude that it was and should have been suppressed. Accordingly, we set aside the findings and sentence and authorize a rehearing.

### Background

Prior to trial the appellant confessed to breaking into another Sailor's locker and stealing personal property. The appellant was subsequently charged with larceny of a wallet, currency, and a gold necklace. Article 121,. Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 921 (1988). The charge was referred to trial by special court-martial. UCMJ arts. 19, 23, 10 U.S.C. §§ 819, 823 (1988). At trial the appellant made a timely motion to suppress his confession on grounds it was "involuntary and obtained under coercion and/or unlawful influence." Rule for Courts–Martial [R.C.M.] 905(b)(3), Manual for Courts–Martial, United States, 1984; Mil. R.Evid. 304; Appellate Exhibit I. The military judge conducted an evidentiary hearing on the motion [1] and admitted the confession. The appellant pled not guilty. Following a bench trial, the appellant was convicted, as charged, and sentenced to confinement for 3 months, forfeiture of $200.00 pay per month for 3 months, a fine of $310.00, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence without modification. UCMJ art. 60, 10 U.S.C. § 860 (1988).

The appellant's case is now before this Court for review in accordance with Article 66, UCMJ, 10 U.S.C. § 866 (1988). The

appellant assigned two errors.[2] Both concern whether the appellant's guilt was proven beyond a reasonable doubt. The Court also directed the parties to brief the issue raised by defense counsel at trial, that is, whether the appellant's pretrial confession should have been suppressed. The parties briefed the issue and oral argument was heard thereon. We confine our discussion to the specified issue.

### Material Facts

The credible evidence of record reflects that sometime after 2300, 16 October 1991, then-Airman Gold discovered that his locker at Fighter Squadron THREE TWO, Hangar 404, Naval Air Station Oceana, Virginia, had been forcibly broken into and his wallet, currency, and a gold necklace had been stolen. The theft was reported to base security. The appellant was on duty in squadron spaces from 1530 to 2300 the same day and had been nearby Airman Gold's locker at 1800 when Airman Gold had opened the locker to retrieve some money from it. The appellant was also observed to have had a screwdriver in his back pocket. Accordingly, he was suspected of stealing Airman Gold's property and was ordered to report back to his squadron.[3] The appellant returned at 2345. At approximately 0130, 17 October 1991, the appellant was placed under apprehension, advised of his rights, and searched by base security personnel. To the apprehending petty officer, the appellant "looked tired," "seemed nervous" and "didn't understand what was going on." *Compare* record at 29 *with* record at 125. At 0200, the appellant was handcuffed and transported to the base security office for interrogation. There the appellant was placed in a small, windowless interrogation room where he remained handcuffed for 15 to 25 minutes.[4] The hand-

---

1. UCMJ art. 39(a), 10 U.S.C. § 839(a) (1988); Mil.R.Evid. 304.

2. I. THERE IS INSUFFICIENT EVIDENCE TO FIND THE APPELLANT GUILTY BEYOND A REASONABLE DOUBT OF THAT PORTION OF THE CHARGE ALLEGING LARCENY OF THE GOLD CHAIN BELONGING TO AIRMAN SHAWN GOLD.
 II. THERE IS INSUFFICIENT EVIDENCE TO FIND APPELLANT GUILTY BEYOND A

REASONABLE DOUBT OF THE CHARGE AND ITS SPECIFICATION.

3. The appellant testified that he had begun "night check" duty about 1 week earlier and that he had awakened at 1000 or 1100 that day. Record at 13–14.

4. The room was estimated to be six feet wide, by 10 to 12 feet long. Record at 193.

cuffs were removed, and the appellant was then interrogated by two base investigators, Master-at-Arms First Class Hofmann and Master-at-Arms Second Class Levesque.

MA2 Levesque commenced the interrogation alone. He also advised the appellant of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *United States v. Tempia*, 16 C.M.A. 629, 37 C.M.R. 249, 1967 WL 4235 (1967) (applying *Miranda* to custodial interrogations in the military), and Article 31(b), UCMJ, 10 U.S.C. § 831(b) (1988). The appellant consented to the interrogation and waived the assistance of counsel. Initially, the appellant denied culpability. MA2 Levesque found the appellant to be nervous and evasive and suspected he was lying. MA2 Levesque then conferred with his supervisor, MA1 Hofmann, outside the interrogation room. The interrogators elected to employ the "good-guy/bad-guy" routine, also known as the "Mutt-and-Jeff" routine. *Compare* record at 41, 56–57, 61, 191–92 *with* record at 144. MA1 Hofmann described this procedure thusly:

The good-guy/bad-guy routine, in interrogation, is widely used. It's actually a very good method, I've found, in my seven years, eight years, of doing them. What it is, is you get the initial contact with the suspect. Initial, you know, police officer, whoever is doing the interrogation. And he, you know, is sympathetic with them, and is very nice and cordial with them. And then he'll go out and he'll get, like, in my—in my case, what I played. The bad guy. The other guy will come in and be, you know, just doesn't want to hear it, doesn't want to hear your lies. "Look, I don't have time to—to play around here. I got better things to do," you know. Raising your voice, slamming doors, stuff—stuff to that effect. Stays in for a very short period of time, says what he's got to say, and leave.

Record at 41.

The interrogators then returned to the interrogation room and carried out their plan. MA1 Hofmann, who was 6'1" and 200 lbs., raised his voice, angrily addressed the appellant, and exited the interrogation room, slamming the door behind him. The procedure required less than 5 minutes to execute. Record at 41, 194.

The appellant also claimed that during the interrogation he was informed that if he did not cooperate that he "wasn't going to go home and that [he'd] wind up in the Virginia Beach jail for the night." Record at 12, 19, 24, 162, 178. MA2 Levesque recalled no mention of the Virginia Beach jail, or for that matter what statements MA1 Hofmann made (record at 62, 145); however, when asked whether he ever mentioned the Virginia Beach jail to the appellant, MA1 Hofmann testified:

I may I, sir [sic]. That's—I've used that many times before in my—my interrogation technique. I'll go in there and I'll—I'll seem like I don't have time to waste. I'll say, "Look, I don't need anything." I said, "I can go right down to Virginia Beach Magistrate and swear out a warrant." And then leave.

Record at 46; *see also* record at 192.

The appellant declined to speak further with MA1 Hofmann, and following MA1 Hofmann's abrupt departure from the interrogation room, MA2 Levesque observed that the appellant had become more nervous and that he had lost rapport with the appellant. Therefore, MA2 Levesque tried to calm the appellant down by assuring him that he, MA2 Levesque, was the one conducting the interview and taking appellant's statement. Record at 52, 57, 145; see also record at 148. The gambit succeeded and the appellant signed a sworn, written confession at 0330.[5] The appellant explained that he felt frustrated, angry, tired, intimidated, and confused and that he made the confession "[j]ust so I could walk." Record at 13, 163–164.

During the course of the interrogation, the appellant was variously observed to be nervous, hesitant, reluctant, evasive, scared, but sober, awake, and coherent. Petty Officers

---

5. Half of the confession was written by the appellant and half by MA2 Levesque. Record at 53. The squadron duty driver came to pick the appellant up one hour after the interview concluded. Record at 13. The appellant was released and went home. Record at 168.

Hofmann and Levesque both characterized MA1 Hofmann's actions as intimidating. *Compare* record at 44, 56–57, 144 *with* record at 193. A psychologist, who subsequently examined the appellant while he was a patient at the Portsmouth Naval Hospital, testified that appellant's discharge diagnosis included an anti-social personality disorder with narcissistic features. He also opined that the appellant would not be any more or any less susceptible to the "Mutt-and-Jeff" technique of interrogation than any other person. Record at 71, 75. Finally, the Government introduced personnel records showing the appellant was 22 years of age, had a high school diploma, had below average entrance test scores, and read at the grade level of 7.9.

Ultimately, the military judge found by a preponderance of the evidence that the appellant's confession was voluntary, denied the motion to suppress, and admitted the confession in evidence. Record at 106, 143. Post-trial, the military judge recorded his essential findings in support of his ruling.[6] Appellate Exhibit XIII. Among other things the military judge found that the MA1 Hofmann stood in the door of the interrogation room approximately 12 feet from the accused, yelled at the accused that he did not have time for him, and "that he could sign a warrant to have him arrested by the Virginia Beach police." *Id.* The military judge observed that although the "Mutt-and-Jeff" approach is not particularly favored in the law, citing *Miranda*, it did not constitute coercion, unlawful influence or an unlawful inducement to confess. Similarly, he concluded that MA1 Hofmann's threat to put the appellant in the Virginia Beach jail was the only inducement in the case, however, "[t]he statement was not amplified or commented upon by MA2 Levesque that confinement in a Navy brig or the Virginia Beach City Jail would be done if [the appellant] didn't make a statement." *Id.* The military judge further registered his doubt respecting the appellant's credibility, and he concluded, "I do not find that coercion, unlawful influence or unlawful inducement were used in obtaining the accused's statement." *Id.*

On appeal, the appellant again asserts that under the totality of these circumstances his confession was involuntary because it was the product of coercion and unlawful influence and should have been suppressed by the military judge. The Government takes a contrary position.

### Standard of Review

■ This Court may affirm such findings of guilty and such part of the sentence as it finds correct in law and fact and determines on the basis of the entire record should be approved. UCMJ art. 66(c), 10 U.S.C. § 866(c) (1988). This Court may hold a finding or sentence incorrect on an error of law only if the error materially prejudices the substantial rights of the appellant. UCMJ art. 59(a), 10 U.S.C. § 859(a) (1988). A Court of Military Review is generally inclined to give deference to the essential findings of the military judge supporting rulings on the admissibility of pretrial confessions, however, inasmuch as the appellant's case comes to the Court for review under Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988), it is not bound by them. *United States v. Jones,* 34 M.J. 899, 905 (N.M.C.M.R.1992). In this case, we have conducted a *de novo* review.

### The Law

■ It is a legal axiom that involuntary pretrial confessions are inadmissible in trials by court-martial. The axiom is founded on the Constitution, statute, and executive order. *See generally United States v. Lonetree,* 35 M.J. 396 (C.M.A.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993); *United States v. O'Such,* 16 C.M.A. 537, 37 C.M.R. 157, 1967 WL 4216 (1967); *United States v. Monge,* 1 C.M.A. 95, 2 C.M.R. 1, 1952 WL 1684 (1952); UCMJ art. 31(d), 10 U.S.C. § 831(d) (1988); Mil.R.Evid. 304. In particular, Article 31(d) of the Code

---

6. The better practice under most circumstances is to prepare and enter essential findings at the time the ruling is made and the evidence is admitted or excluded. This practice affords counsel the opportunity to suggest corrections to the essential findings. It also is a discipline which serves the deliberative process at the time the decision is made. Otherwise, essential findings may well become nothing more than a *post hac* rationalization.

provides that "[n]o statement obtained from any person ... through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." UCMJ art. 31(d), 10 U.S.C. § 831(d) (1988). Military Rule of Evidence 304(a), promulgated by the President pursuant to his rule-making authority under Article 36(a) of the Code, also provides that, with exceptions not pertinent here, an involuntary statement may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress. A statement is "involuntary" under the rule "if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, [UCMJ] or through the use of coercion, unlawful influence, or unlawful inducement." Mil.R.Evid. 304(c)(3). When an appropriate motion or objection has been made by the defense, the prosecution has the burden of establishing the admissibility of the confession, and before the confession may be admitted, the military judge must be satisfied by a preponderance of the evidence that the confession was voluntarily made. Mil.R.Evid. 304(e).

 The principles for determining whether a pretrial statement was the product of coercion, unlawful influence, or unlawful inducement are essentially the same whether the challenge is based on the Constitution, Article 31(d), or Mil.R.Evid. 304. The principles may be summarized as follows:

(1) If the confession is the product of an essentially free and unconstrained choice by its maker, it may be used against him. If his will has been overborne and his capacity for self-determination critically impaired, the confession may not be used against him.

(2) Whether a particular accused's will has been overborne and broken must be decided on the peculiar, individual facts of his case.

(3) The totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation—must be assessed.

(4) Some of the factors to be taken into account include: the accused's age; his education; his intelligence; the advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep.

(5) The import of the factors vary according to the circumstances and the state of mind of the accused.

(6) The constituent elements of the interrogation leading to the confession may be reviewed separately, however, the circumstances should be evaluated together.

(7) Absent police conduct causally related to the confession, there is no basis for concluding a confession was involuntarily induced, and even where there is a causal connection between the actions of Government agents and an accused's confession, it does not automatically follow that the confession was involuntary.

(8) Ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary, provided they do not rise to the level of compulsion or coercion.

(9) Ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.

*Jones,* 34 M.J. at 906–07 (citations and quotations omitted); *see also United States v. Lincoln,* 40 M.J. 679 (N.M.C.M.R.1994).

### Application

 We pause to discuss two constituent elements of the circumstances separately, mindful of the requirement to evaluate the totality of the circumstances together. Neither party has cited to us, and we are unaware of, any military case in which the "Mutt-and-Jeff" or "good-guy/bad-guy" routine has been held to render a confession *per se* coerced and inadmissible. *See generally United States v. Leiker,* 37 M.J. 418 (C.M.A. 1993); *United States v. Hanna,* 2 M.J. 69 (C.M.A.1976); *United States v. Attardi,* 20 C.M.A. 548, 43 C.M.R. 388, 1971 WL 12805 (1971); *United States v. Howard,* 18 C.M.A.

252, 39 C.M.R. 252, 1969 WL 5965 (1969); *United States v. Nichols*, 38 M.J. 717 (A.C.M.R.1993). On the other hand, the *Miranda* rules were issued to counterbalance the psychological ploys used by police to obtain confessions, including this particular technique. *Leiker*, 37 M.J. at 420. Thus, while the "Mutt-and-Jeff" routine may not *per se* render a confession coerced, it is a psychological ploy which should be considered, along with all other relevant facts and circumstances, in determining whether an accused's will was overborne and his confession was obtained through the use of coercion, unlawful influence, or unlawful inducement. *Cf. United States v. Martinez*, 38 M.J. 82 (C.M.A.1993). In disposing of the issue in the appellant's case we do not suggest that but for the use of the "Mutt-and-Jeff" routine, the appellant's confession would have been voluntary. Rather, we have considered the use of this technique as one of the factors bearing upon voluntariness, and we have considered it as a part of the entire dynamic of the interrogation.

Of all of the ploys employed in this interrogation, however, the one of most concern is the threat to deprive the appellant of his liberty and subject him to prosecution by the civilian authorities if he did not cooperate by admitting his guilt. In *Jones* we observed that "[t]hreats to prosecute or hold an accused in custody unless a statement is made are improper and will render a statement inadmissible." 34 M.J. at 907. In *United States v. Steward*, 31 M.J. 259 (C.M.A.1990), the United States Court of Military Appeals observed that

> Federal civilian practice does not support a finding of involuntariness simply because a police officer told a suspect in a noncommittal manner that he would call the appropriate authorities' attention to a suspect's cooperation with police. However, a specific threat to report a suspect's failure to cooperate with police to appropriate authorities may render a subsequent confession involuntary in these same courts, assuming it is the motivating factor in the suspect's decision to speak. Consideration of the voluntariness question in light of these decisions as well would be particularly appropriate.

31 M.J. at 265–66 (citations omitted). Finally, we note that the "drafter's analysis" to Mil.R.Evid. 304(c)(3) states:

> Insofar as [Mil.R.Evid.] 304(c)(3) is concerned, some examples which may by themselves or in conjunction with others constitute coercion, unlawful influence, or unlawful inducement in obtaining a confession or admission are:
>
> \* . \* \* \* \* \*
>
> Imposition of confinement or deprivation of privileges or necessities because a statement was not made by the accused, or threats thereof if a statement is not made;
>
> \* \* \* \* \* \*
>
> [T]hreats of disadvantage likely to induce the accused to make the confession or admission.

Applying the aforementioned principles, we must now evaluate together the relevant facts and circumstance, both pro and con, recalling that the Government bears the burden of establishing voluntariness. The appellant was a 22–year–old, junior enlisted man of average intelligence. He was recalled to his squadron at midnight, following completion of duty which began some 9 hours before. He was under apprehension for a period of 2 hours before he signed his confession. At the outset of his apprehension he was searched and informed of his rights. He was placed in handcuffs and transported from his squadron to the base security office. He was in handcuffs for a period of 15 to 25 minutes. Following a re-advisement and waiver of rights, he was interrogated by MA1 Hofmann and MA2 Levesque for a period of approximately 1 hour and 15 minutes before he signed a sworn, written confession at 0330. When the appellant initially denied culpability, Petty Officers Hofmann and Levesque elected to employ the "good-guy/bad-guy" technique for the purpose of obtaining the appellant's admission of guilt. More significantly, MA1 Hofmann threatened the appellant with arrest by the local authorities unless the appellant cooperated. The clear import of the threat was that the appellant would be further deprived of his liberty and subjected to prosecution by the civilian au-

thorities unless he admitted stealing Airman Gold's property. Given MA1 Hofmann's position on the security force, it would appear to someone of average intelligence that he had the means to make the threat good. The purpose of the threat was patent—to extract a confession from the appellant by means of intimidation. In any case, the evidence irrefutably reflects that these ploys were successful. The conclusion that the appellant retained sufficient free will to disregard the threat, delivered by means of the stratagem of the "Mutt-and-Jeff" routine, was a matter of pure speculation. In short, based on the totality of the circumstances of appellant's case, we remain unpersuaded that the Government carried its burden of establishing by a preponderance of the evidence that the confession was not obtained through the use of coercion, unlawful influence, or unlawful inducement.[7] We further conclude that the error in admitting the appellant's pretrial confession was of sufficient magnitude that it materially prejudiced his substantial rights and was not harmless beyond a reasonable doubt. *United States v. Remai*, 19 M.J. 229 (C.M.A.1985); *see also United States v. Grooters*, 39 M.J. 269 (C.M.A.1994); *United States v. Palacios*, 37 M.J. 366 (C.M.A.1993); UCMJ arts. 59(a), 66(c), 10 U.S.C. §§ 859(a), 866(c) (1988). Accordingly, we are obliged to set aside his sentence and conviction.

### Disposition

The findings of guilty and the sentence are set aside. A rehearing may be ordered. UCMJ art. 66(d), 10 U.S.C. § 866(d) (1988).

Judge DeCICCO concurs.

WELCH, Senior Judge (dissenting):

I respectfully dissent. I agree with the conclusions of the trial judge.

In applying the totality of the circumstances test to determine whether a confession is voluntary, a court's inquiry should center on 3 sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. *Green v. Scully*, 850 F.2d 894 (2d Cir.1988). The test "anticipates a holistic assessment of human interaction." *United States v. Martinez*, 38 M.J. 82, 87 (C.M.A.1993). In applying this test, this Court should recall that

> the military judge was in a unique position to decide the appropriate weight to give appellant's assertion of an overborne will. His vantage point is one that simply cannot be reproduced ... by the Court of Military Review.... Where ... the military judge expresses special influence of that unique viewpoint on his judgment, that expression must weigh heavily in our reaching our own determination.

*Martinez*, 38 M.J. at 86.

When we focus attention on the first 2 sets of circumstances mentioned above, we find nothing significant that supports the appellant's assertion that his confession was coerced. To the contrary, when he made his confession, the appellant was 23 years of age, a high school graduate, and a man of about average intelligence with approximately 2½ years experience in the Navy. An expert testified concerning the appellant's anti-social personality, opining that the appellant's personality disorder would have no effect on his susceptibility to interrogation techniques. Additionally, prior to confessing the appellant clearly waived his rights after being thoroughly advised of those rights. During his interrogation, the appellant stated neither a desire to terminate the interrogation nor to consult counsel. He was never deprived of food or drink or physically abused. The interrogation prior to his oral confession was relatively brief (i.e., approximately 45 minutes). The late hour of the interrogation is insignificant because the appellant worked a late shift and was apprehended approximately 3 hours after the end of his normal duty hours. When questioned, the appellant was stone-cold sober; he did not then appear fatigued. Significantly absent from this case are any of the many factors frequently cited as indicia of a coerced confession (e.g., a

---

7. In his essential findings, the military judge stated, "I do not find that coercion, unlawful influence or unlawful inducement were used in obtaining the accused's statement." Appellate Exhibit XIII. This finding suggests the military judge may have imposed the burden of proving a lack of coercion, etc., on the appellant.

youthful accused, an accused of exceptionally low intelligence, prolonged interrogation, an intoxicated accused, an accused under the influence of drugs).

Given the factors mentioned above, the only issue in this case is whether the conduct of the law enforcement officials, when considered with all other circumstances presented, was such that the appellant's confession was the product of an overborne will and therefor not a free and voluntary act.

Turning to the third and critical set of circumstances, I note that the appellant was handcuffed for transportation purposes, a routine procedure, and the handcuffs were removed while he was interrogated. Before interviewing the appellant, the law enforcement official with him fully advised him of his rights and obtained a knowing and intelligent waiver of those rights. The "good guy/bad guy" technique of interrogation that was subsequently used is not inherently evil and is a permissive interrogation technique—unless it goes too far. MA1 Hofmann was part of the appellant's interrogation for only 2 to 3 minutes. During that time, he obviously created some apprehension in the appellant's mind when he loudly proclaimed that "he didn't have time for the accused, and that he could sign a warrant to have him arrested by the Virginia Beach Police," according to the military judge's findings, and slammed the door when he left the room. In this regard, I note that the appellant's testimony was that MA1 Hofmann said that if he did not cooperate, he would "wind up in the Virginia Beach City Jail for the night." Record at 12, and that MA1 Hofmann's testimony was that he would usually say under such circumstances "Look, I do not need anything. I can go right down to Virginia Beach magistrate and swear out a warrant." Record at 46. After MA1 Hofmann's cameo appearance, MA2 Levesque treated the appellant nicely and the appellant did not feel intimidated by MA2 Levesque, although he did not trust him because he believed "[n]ever trust a nice guy." Record at 177. Thereafter, after continuing questioning, the appellant orally confessed to MA2 Levesque. His oral confession was followed by a neatly printed holographic confession that was started at 0300, subsequently expanded upon by questions and answers penned by MA2 Levesque, and sworn to by the appellant at 0330.

In his findings, the military judge noted that the statement by MA1 Hofmann was not amplified upon or commented upon by MA2 Levesque during his subsequent "good guy" questioning of the appellant. Then, the judge significantly acknowledged the obvious: that although the appellant had testified that he was afraid that he would be confined if he did not make a statement, a number of inconsistencies in his testimony and the testimony of other witnesses "bring this statement into question." App.Ex. XIII at 2. Stated otherwise, the military judge carefully evaluated the appellant's performance on the witness stand and, based on all the evidence presented, concluded that the appellant was not being candid with the judge. Although the judge did not explain in detail the basis for his conclusion, the record contains considerable evidence which convinces me that the appellant was attempting to manipulate the facts to his benefit. For example:

a. When asked by trial counsel if the appellant's rights had been explained to him, the appellant responded "I can't recall," and only admitted that he had been informed of his rights after being thoroughly cross-examined on that point by the trial counsel. Record at 16–17.

b. When asked by his counsel if he felt physically threatened when MA1 Hofmann entered the room, the appellant replied "I thought he was going to come after me for not cooperating with him. He was going to hit me." Record at 12. Later, on cross-examination, the appellant admitted that MA1 Hofmann never touched him. Record at 19.

The nature of the "threat" alleged must also be considered. About all it boils down to is that MA1 Hofmann conveyed the message to the appellant that at about 0200 he was able to go to a magistrate (i.e., a judicial official) and obtain a warrant that would cause the appellant to remain in jail for the remainder of the night. Frankly, I have grave doubts about whether this comment would create fear in the heart of *any* 23 year old Sailor of such enormity that his will

would be overborne and he would confess to larceny of a shipmate's property.

Finally, in determining whether the appellant's confession was voluntary, I place considerable weight on the fact that MA2 Levesque properly advised the appellant of his suspect's rights, that the appellant voluntarily waived those rights, and that the appellant, a mature adult, never attempted to terminate the interview or consult a lawyer. As stated recently by the United States Supreme Court, "[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'" *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994) (citing *Moran v. Burbine,* 475 U.S. 412, 427, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1986)).

At the bottom line, I am convinced that the military judge was in a superb position to accurately evaluate all the evidence—particularly the appellant's testimony—and that he wisely concluded, based on all circumstances presented, that the appellant was "blowing smoke" (my words) when he contended that he confessed to committing larceny solely because of MA1 Hofmann's "bad guy" routine. Additionally, I am confident that the military judge properly understood the burden of proof in this case and did not inappropriately transfer it to the appellant. I would affirm.