UNITED STATES, Appellant

v.

Christopher J. BUBONICS, Airman
U.S. Navy, Appellee.

No. 94–5011.
CMR No. 92 2014.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 5, 1995.

Decided Sept. 24, 1996.

For the Accused: *Major Steven P. Hammond*, USMC (argued); *Major Hagen W.*

*Frank,* USMC (on brief); *Commander Mary T. Hall,* JAGC, USN.

For the United States: *Colonel Charles W. Dorman,* USMC (argued); *Colonel J. Composto,* USMC, *Commander S.A. Stallings,* JAGC, USN, *Lieutenant Commander David B. Auclair,* JAGC, USN (on brief); *Commander Thomas R. Tarbox,* JAGC, USNR.

## Opinion of the Court

EVERETT, Senior Judge:

After a contested trial at Naval Air Station Oceana, Virginia Beach, Virginia, a special court-martial (military judge sitting alone) convicted Bubonics of larceny of personal property from a fellow sailor's locker, *see* Art. 121, Uniform Code of Military Justice, 10 USC § 921. His sentence, which the convening authority subsequently approved 139 days after trial, extended to a bad-conduct discharge, confinement and forfeiture of $200.00 pay per month for 3 months, a fine of $310.00 (with provision for further confinement if not paid), and reduction to the lowest enlisted grade.

In the Court of Military Review[1], Bubonics maintained, as he had at trial, that his confession to the larceny should not have been admitted into evidence because it was the involuntary product of police coercion, unlawful influence, or unlawful inducement. *See* Mil.R.Evid. 304(a) and (c)(3), Manual for Courts–Martial, United States (1995 ed.). A majority of that court agreed and set aside the conviction and sentence, with one judge dissenting. 40 MJ 734, 741 (1994).

In timely fashion thereafter, the Judge Advocate General sent the case to this Court, *see* Art. 67(a)(2), UCMJ, 10 USC § 867(a)(2)(1989), and asked us to answer the following two-part question:

DID THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERR AS A MATTER OF LAW IN REVERSING THE MILITARY JUDGE'S FIND-

ING THAT [THE ACCUSED'S] CONFESSION WAS INADMISSIBLE WHEN:

1. IT HELD, IMPLICITLY, THAT A CONFESSION IS *PER SE* INADMISSIBLE WHEN A STATEMENT WHICH COULD BE CONSTRUED TO BE A THREAT TO PROSECUTE OR HOLD AN ACCUSED IN CUSTODY UNLESS HE CONFESSED IS MADE DURING AN INTERROGATION; AND,

2. UNDER THE TOTALITY OF THE CIRCUMSTANCES [THE ACCUSED'S] CONFESSION WAS NOT THE PRODUCT OF COERCION, UNLAWFUL INFLUENCE OR UNLAWFUL INDUCEMENT?

Now, we hold that: 1) the first part of the certified question is premised on a misconstruction of the majority opinion below, which does reflect a proper consideration of the totality of the circumstances when evaluating the voluntariness of Bubonics' confession, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973);[2] and 2) upon considering the totality of the circumstances as it found those circumstances to be, the court below reached the permissible conclusion that the confession was involuntarily given as a result of "coercive police activity," *see generally Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), and *United States v. Norfleet,* 36 MJ 129, 131 (CMA 1992) (causal connection necessary between coercive police conduct or overreaching and confession).

## I

■■■ Voluntariness of a confession is a question of law that an appellate court independently reviews, *de novo. Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991); *United States v. Martinez,* 38 MJ 82, 86 (CMA 1993); S. Childress & M. Davis, 2 *Federal Standards of Review* [hereafter Childress & Davis] § 11.13 (2d ed. 1992); *see* 1 *Childress &*

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. Although *Schneckloth* involved voluntariness of consent to a search—rather than voluntariness of

a confession—the Supreme Court explained that the same analysis would apply to either issue. 412 U.S. 218, 273–74, 93 S.Ct. 2041, 2071–72, 36 L.Ed.2d 854 (1973).

*Davis, supra,* § 2.14. The necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker. If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). The burden in this regard is on the Government, as the proponent of admission of the evidence, to prove by a preponderance of the evidence that the confession was voluntary. Mil. R.Evid. 304(e); *United States v. D.F.,* 63 F.3d 671, 679 (7th Cir.1995).

As the first part of the certified question recited above suggests, this inquiry involves an assessment of "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte, supra* at 226, 93 S.Ct. at 2047. Here, however, the Government contends that, rather than putting all the surrounding circumstances onto the scale, the Court of Military Review focused almost exclusively on the interrogator's threat to turn Bubonics over to civilian authorities for confinement, and impliedly prosecution, unless he confessed to the larceny.

We do not agree with this characterization of the majority opinion below. In two separate portions of the opinion—once in the section headed *"The Law"* and later in the section entitled *"Application"*—it clearly articulated its responsibility to assess the "totality of all the surrounding circumstances." 40 MJ at 739, 741. Additionally, it reaffirmed its awareness of this principle when it discussed the impact on voluntariness of the " 'Mutt-and-Jeff' [good-guy/bad-guy] routine" used by the two interrogators; the majority referred to that tactic as "a psychological ploy which should be considered, *along with all other relevant facts and circumstances,* in determining whether an accused's will was overborne and his confession was obtained through the use of coercion, unlawful influence, or unlawful inducement." *Id.* at 740 (emphasis added). Finally, it is clear to us that the majority below did not merely pay lip service to this principle: In a lengthy paragraph concluding its analysis in the *"Application"* section of its opinion, the majority below extensively set out with particularity "the relevant facts and circumstances, both pro and con . . . ." *Id.* at 740–41.

Of course, we recognize that the majority below was greatly influenced by the effective combination of two particular factors: the threat to turn appellant over to civilian authorities, made in the context of a good-guy/bad-guy interrogation style. Indeed, in holding that the Government had not carried its affirmative burden to show voluntariness, Senior Judge Mollison for the majority wrote: "The conclusion that the appellant retained sufficient free will to disregard the threat, delivered by means of the stratagem of the 'Mutt-and-Jeff' route, was a matter of pure speculation." *Id.* at 741.

■ The court's responsibility to consider the totality of the surrounding circumstances, however, does not translate into a prescription to weigh *all* such factors *evenly.* The majority below forthrightly wrote that, while assessing all relevant factors, "[t]he import of the factors vary according to the circumstances and the state of mind of the accused." *Id.* at 739. We cannot quarrel with such common sense. In fact, it seems logically self-evident—from the mandate, itself, to consider the totality of all the circumstances—that the risk of havoc posed by a bull in a china shop is distinctly different from such a risk posed by the same bull in a pasture. *See generally United States v. Martinez,* 38 MJ at 87 (" 'Totality of the circumstances' does not connote a cold and sterile list of isolated facts; rather, it anticipates a holistic assessment of human interaction.").

## II

Having said the foregoing, we now acknowledge that our own analysis, on *de novo* review of the voluntariness of Bubonics' confession, essentially parallels that of the majority opinion in the Court of Military Review. 40 MJ at 739–41. Accordingly, with regard to the circumstances surrounding the confession and in answer to the second part

of the certified issue, we adopt the opinion below rather than reiterate it.

■ To that analysis, however, we add the observation that there was no evidence that Bubonics ever had been involved with military justice before the night of his apprehension and interrogation. Suddenly, this sailor of some 2 1/2 years' experience, 40 MJ at 741, who had been conditioned throughout that time to respond with discipline to figures of authority, was apprehended, placed in irons, and transported to a small interrogation room. When he did not react in a manner to please his interrogator, a supervisory agent stormed into the room; vented his wrath; "yell[ed] at the accused that he didn't have time for the accused, and that he could sign a warrant to have him arrested by the Virginia Beach Police"; and "slammed the door when he left the door way...."

We recognize, of course, that appellant was advised of his pertinent rights under Article 31, UCMJ, 10 USC § 831. Under usual circumstances, such an advisement fairly could be seen to overcome any psychological pressure to respond to authority, to which this Court long has been sensitive. *See, e.g., United States v. Harvey,* 37 MJ 140, 143 (CMA 1993); *United States v. Lewis,* 12 MJ 205, 206 (CMA 1982); *United States v. Duga,* 10 MJ 206, 210 (CMA 1981); *United States v. Armstrong,* 9 MJ 374, 378 (CMA 1980); *United States v. Gibson,* 3 USCMA 746, 752, 14 CMR 164, 170 (1954). Consistent with the view of the majority below, however, we do not believe that this combination of factors—a threat to turn Bubonics over to civilian

authorities, made in the context of a disfavored (though not *per se* coercive) good-guy/bad-guy interrogation tactic, by a person in a position of authority over a sailor who has been conditioned to respond to authority—is a usual circumstance.

■ Accordingly, after a *de novo* assessment of the totality of the circumstances, both pro and con, we agree with the majority of the Court of Military Review[3] in light of the foregoing, that the Government did not carry its affirmative burden to demonstrate by a preponderance of the evidence that Bubonics' confession was voluntarily given as a product of his own free will and intellect. Although the Government has made no claim in this Court that admission of the confession into evidence, if error, was harmless, we add that we agree with the majority below (40 MJ at 741) as well, that it was not.

### III

The decision of the United States Navy–Marine Corps Court of Military Review setting aside the findings and sentence is affirmed.

Chief Judge COX and Judge GIERKE concur.

SULLIVAN, Judge, with whom CRAWFORD, Judge, joins (dissenting):

I would set aside the decision of the Court of Military Review and reinstate the findings and sentence of the military judge. Accordingly, I respectfully dissent.

3. The Government points out that, when considering voluntariness of a confession in *United States v. Martinez,* 38 MJ 82, 86 (CMA 1993), we commented that "the military judge was in a unique position to decide the appropriate weight to give appellant's assertion of an overborne will," which "vantage point is one that simply cannot be reproduced, either by the Court of Military Review or by this Court." That case was a government appeal under Article 62, Uniform Code of Military Justice, 10 USC § 862, from an interlocutory ruling by the military judge. This case, however, came to the Court of Military Review in the usual course of appellate review under Article 66, UCMJ, 10 USC § 866. In this instance, that court is free to apply its "awesome, plenary, *de novo* power of review"

and to "'substitute its judgment' for that of the military judge." *See United States v. Cole,* 31 MJ 270, 272 (CMA 1990).

Moreover, the above-quoted language from *Martinez* was stated in the context of a military judge having expressed that he had been "particularly impressed with appellant's own testimony." We commented as follows about that unusual occurrence: "Where, as here, the military judge expresses special influence of that unique viewpoint on his judgment, that expression must weigh heavily in our reaching our own determination." 38 MJ at 86. Thus, properly viewed, both as to legal posture and as to the special circumstances of that case, we see no inconsistency between *Martinez* and our opinion today.

Whether a confession is voluntarily made is ultimately a question of law. *See Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991). There is no *per se* rule for evaluating the voluntariness of a confession. *See id.* at 285, 111 S.Ct. at 1251 (acknowledging rejection of the *per se* standard of *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897)); *accord United States v. Murphy*, 18 MJ 220, 225 (CMA 1984). Thus, to the extent that the court below used a *per se* rule in analyzing the accused's confession, that court erred as a matter of law.

The appropriate test to determine voluntariness of a confession requires an assessment of "the totality of all the surrounding circumstances." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *accord Arizona v. Fulminante, supra* at 285–86, 111 S.Ct. at 1251. Such a voluntariness inquiry involves two questions:

[First,] whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means.... [Second,] whether the defendant's will was in fact overborne.

*United States v. Martinez*, 38 MJ 82, 87 (CMA 1993) (Sullivan, C.J., concurring in the result), quoting *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). In light of these principles, I believe the Court of Military Review erred as a matter of law in determining that the accused's confession was involuntary.

The Supreme Court has recognized the "Mutt and Jeff" routine as a valid interrogation technique. *See Miranda v. Arizona*, 384 U.S. 436, 452, 86 S.Ct. 1602, 1616, 16 L.Ed.2d 694 (1966). I can find no case that has held a confession was *per se* coerced as a result of its use. Moreover, this Court has held that informing a suspect of his or her rights under the Fifth Amendment and Article 31, Uniform Code of Military Justice, 10 USC § 831, counterbalances the coercion inherent in psychological ploys such as the Mutt-and-Jeff routine. *See, e.g., United States v. Leik-*

*er*, 37 MJ 418, 420 (CMA 1993) (recognizing that "*Miranda* rules were issued to counterbalance the psychological ploys used by police"); *see also United States v. Howard*, 18 USCMA 252, 256–57, 39 CMR 252, 256–57 (1969) (holding that the Mutt-and-Jeff routine did not affect the accused's ability to decide to remain silent during the interrogation); *cf. Davis v. United States*, 512 U.S. 452, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994) (quoting *Moran v. Burbine*, 475 U.S. 412, 427, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1986) ("[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' ")

In this particular case, Master at Arms Second Class (MA2) Levesque began the interview with the accused by apprising him of his Article 31 rights, as well as his right to terminate the interview at any time. The accused indicated that he understood his rights by initialing next to each written right, and he then executed a written waiver of those rights. The advisement as to, and the subsequent waiver of, the accused's rights vitiates any coerciveness of the Mutt-and-Jeff tactic. Thus, the Mutt-and-Jeff psychological ploy as applied in this case was "compatible with a system that presumes innocence," and the confession was not "secured by inquisitorial means." *See* 38 MJ at 87.

Furthermore, the Mutt-and-Jeff technique may have tested the accused's will, but his will was not overborne to such a degree that the confession was involuntary. Here, the military judge ruled, and I agree, that the Government proved by a preponderance of the evidence that the accused's confession was voluntary. The military judge expressly "found that MA1 Hofmann stood in the door of the interrogation room approximately 12 feet from the accused, yelled at the accused that he did not have time for him, and 'that he could sign a warrant to have him arrested by the Virginia Beach Police.' " 40 MJ 734, 738 (1994). Significantly, the distance at which MA1 Hofmann stood from the accused undercuts the accused's assertion that he

feared that MA1 Hofmann would physically assault him. The military judge observed further that MA1 Hofmann's "statement was not amplified or commented upon by MA2 Levesque" and that the accused's credibility was questionable.

In addition to the observations expressed by the military judge, the following circumstances also suggest that the accused's confession was voluntarily made: The accused was almost 23 years old and of approximately average intelligence (he read at grade level 7.9); he had 2 1/2 years' experience in the Navy; an expert testified that the accused's personality disorder would not make him "more or less susceptible to" interrogation techniques; authorities informed the accused of his rights and he then waived those rights; he signed a sworn, written confession; he was handcuffed merely "for transportation purposes, a routine procedure, and the handcuffs were removed while he was interrogated." 40 MJ at 738, 741, 738, 737, and 742. Contrary to the majority's characterization, I submit that these conditions are not unusual in the context of police investigations and interrogations leading to voluntary confessions.

Moreover, as correctly noted by Senior Judge Welch in his dissent below, conspicuously absent from this case are any of the many distinctive marks of a coerced confession. 40 MJ at 741–43. *See, e.g., Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (accused of low intelligence and physically fatigued at time of confession); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (accused interrogated by 15 individuals); *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (uneducated accused of low intelligence); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (interrogation of 15–year–old boy); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (accused questioned by relays of officers for 36 hours). The absence of these indicators in the case at bar, though not dispositive, supports the conclusion that the accused's confession was voluntary.

Finally, I must part from the majority because this decision places an unbearable burden on those who devote their careers to enforcing the law. At the cornerstone of our system of law is the presumption that an accused is innocent until proved guilty. Our jurisprudence also recognizes, however, the need for effective methods to combat crime. *See Schneckloth v. Bustamonte, supra* at 225, 93 S.Ct. at 2046–47; *Miranda v. Arizona, supra* at 481, 86 S.Ct. at 1631; *Spano v. New York,* 360 U.S. at 315, 79 S.Ct. at 1203. I simply cannot conclude that when law enforcement officials use standard procedures to transport an experienced sailor with average intelligence to an interrogation room, advise him of his rights which he knowingly and intelligently waives, and then successfully employ an interrogation stratagem approved by the Supreme Court of the United States, those officials coerce a confession. In my view, arriving at such a conclusion casts a plague on the law enforcement community.