554

## UNITED STATES

v.

**Shawn P. MURRAY, 075 72 8746, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 96 00115.**

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 30 June 1995.

Decided 16 Dec. 1996.

William E. Cassara, Civilian Defense Counsel.

LT Leslie K. Burnett, JAGC, USNR, Appellate Defense Counsel.

Col Charles Wm. Dorman, USMC, Appellate Government Counsel.

Before McLAUGHLIN, Senior Judge, and LUCAS and WYNNE, JJ.

McLAUGHLIN, Senior Judge:

The appellant was tried and convicted, pursuant to conditional pleas of guilty under Rule for Courts–Martial 910(a)(2), Manual for Courts–Martial, United States (1995 ed.)[MCM]. He was found guilty of two specifications of assault on a child under the age of 16 years with a force likely to produce death or grievous bodily harm in violation of Article 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 934 (1994). The appellant admitted to injuring the child through culpable negligence. Record at 72. The victim was approximately 1 year old and suffered serious head, rib, and limb injuries. The victim was a foster child in the care and custody of the appellant and his wife.

 The appellant has assigned a single error in the case.[1] We heard oral argument on 3 October 1996. We find that the military judge did not err in denying the appellant's motion to suppress his pretrial confession. We are guided in our review by the recent case of *United States v. Bubonics,* 45 M.J. 93 (C.M.A.1996). In reaching our decision we have reviewed the military judge's decision *de novo* and assessed "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Bubonics,* 45 M.J. ——, slip

---

1. THE MILITARY JUDGE ABUSED HIS DISCRETION TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY REFUSING TO SUPPRESS THE ACCUSED'S PRE-TRIAL [SIC] CONFESSION.

op. at 4 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). In our analysis, we focus on the defense proposition that the appellant confessed either because he and/or his wife were threatened with jail, or because the appellant was threatened with losing his unborn child to state authorities, or because the appellant was promised counseling instead of a court-martial.

We note that the appellant was a 20–year-old high school graduate. He had been on active duty for over 2 years. The record indicates he had no difficulty in understanding his rights or reading documents. The record also indicates that he voluntarily waived his rights to counsel and to remain silent.

On the day of the interrogation, 14 October 1994, Special Agent Minnick arranged for the appellant's unit to make him available to be picked up and brought to the Naval Criminal Investigative Service [NCIS] local office. Record at 19–20. They arrived at the office by 0800 and the rights advisement began at 0809. By 0811, the appellant had executed a written waiver of his rights. The appellant was not under apprehension. He had not undergone any disruptive, humiliating, or intrusive treatment in his transport from the command to the NCIS office. *See United States v. Fagan*, 28 M.J. 64 (C.M.A.), *cert. denied*, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 48 (1989). This was a regular workday. The record indicates that the appellant had access to head facilities, rest breaks, and refreshments. Record at 24; Appellate Exhibit XVII p. 2 ¶ 13.

From 0811 until approximately 1000, Special Agent Minnick conducted an interrogation that was "very accusatory in nature." Record at 21. The agent told the appellant that "we had confirmed that the child's injuries had to have come from either himself or his wife." *Id.* With regard to references to the appellant's pregnant wife, Special Agent Minnick testified:

Q. Special Agent Minnick, getting back to when you interviewed the accused's wife, Misty Murray, had you referenced her in your interrogation of the accused in the morning hours prior to her arrival at NCIS?

A. Yes, sir.

Q. How did you do that?

A. I talked to Lance Corporal Murray and just advised him that we had already established that this child was in their care and custody all the time. We had accounted for times when the child wasn't in their care and custody and could confirm that the child was never injured when he was out of their custody.

Q. Did you make any reference to the fact as to who must have caused the injuries?

A. Yes, sir, I did.

Q. How did you do that?

A. I just let Lance Corporal Murray know that if he hadn't done it and his wife hadn't done it, one or the other of them were responsible for the injuries to this child.

Q. At any point did you indicate that the wife could be charged by someone?

A. Yes, sir, I did.

Q. How did you do that?

A. I just—and I don't specifically remember this, but I wouldn't deny that I said it. I would have probably said that if you didn't do it, your wife can be charged in the state court.

A. Did you indicate to him that if he didn't make a statement his wife would be charged?

Q. No, sir, I did not.

Q. Did you indicate to him that if he didn't make a statement that his wife would be imprisoned?

A. No, sir, I did not.

Record at 29–30. After establishing that the agent and the appellant both knew that Mrs. Minnick was pregnant, the trial counsel continued the questioning:

Q. Did you ever reference to him an indication that the child would be taken from him and his wife upon its birth?

A. Absolutely not.

Q. Did you ever tell him that if he didn't make an admission or confess that the

child would be taken from either his custody or his wife's custody?

A. No, sir, I did not.

Record at 30–31.

Special Agent Minnick mixed his accusations with a softer approach. The special agent had information that the appellant had been abused as a child. Record at 21. Special Agent Minnick also suggested that if the victim's injuries were accidental they should be discussed. *Id.* During this time period, the appellant explained the source of a burn on the child's arm but did not explain any other injuries. *Id.* Another agent questioned the accused for about 30 minutes after Special Agent Minnick thought that he was not getting anywhere. Record at 20–21. After this 2 hour and 30 minute interrogation, the appellant was left alone in the interrogation room until he was served lunch from 1215 to 1245. Record at 22–23. It appears from the record that the accusatory portion of the interrogation lasted only 2 hours and 30 minutes. At 1245, Special Agent Minnick returned to the appellant and began preparing the appellant's statement of denial. From about 1330 to 1550, Special Agent Minnick faced his computer and typed out the appellant's statement as it developed. Record at 26. According to the record, at about 1515, Special Agent Minnick decided to give it "one last ditch effort to get an admission out of [appellant]." Record at 27, 44. The appellant had never indicated a desire for legal representation or a hesitancy to discuss the victim with Special Agent Minnick. As the agent testified at trial, his last ditch effort produced the following information:

A. I just ah—once again, I don't know the exact words, but I basically said, 'Shawn, you know this is bullshit. I know this is bullshit. Had I been able to speak with you the day this baby went to the hospital, you would have spilled your guts to me. The only reason you are not telling me the truth now, is that you told your wife lies. You have told your in-laws lies and you have told all the medical providers lies. I feel that you are just too embarrassed to admit what really happened now.'

Q. What did you do at that point?

A. Just a pause and I basically said, 'Today is going to be the last time you are going to be able to tell the truth and be honest about this thing.' I turned my back to the computer and that's when he made his first admission. His words were, words to the effect, 'I was screwing around with her like she was a five year old child, like I do with my cousins.'

Q. How was his demeanor at that point?

A. He—right after he verbalized this, he slumped forward and started sobbing.

Q. Sobbing?

A. Yes, sir, sobbing or crying.

Record at 27.

We find nothing unlawfully coercive in the timing, length, conduct, or setting of the appellant's interrogation. Mil. R. Evid. 304(c)(3).

In the child-sexual abuse case of *United States v. Moreno,* 36 M.J. 107 (C.M.A.1992), the U.S. Court of Military Appeals (now the U.S. Court of Appeals for the Armed Forces) decided, among other issues, what effect a state social-investigation worker had on th voluntariness of the accused's confession when she honestly assessed and discussed his options with him. Even though the Court concluded that the social worker was neither a police officer nor an agent of the military for Constitutional or Article 31, UCMJ purposes, 10 U.S.C. § 831, it analyzed the voluntariness of the accused's statement to her under the Fifth Amendment. Specifically, the social worker informed the accused of several possible negative repercussions for him and his family if he did not cooperate. Further, when she explained to the accused that she was subject to subpoena regarding anything that was said between them, she qualified this by stating that a recommendation from the state agency she worked for regarding post-guilty plea probation was often influential. *Id.* at 110 n. 1. The *Moreno* court stated:

Admittedly, appellant was faced with a choice. On the one hand, he was offered the opportunity of enlisting the aid and support of the Texas Department of Human Services [DHS] in trying to keep his family together, in helping himself to over-

come his personal problem, and in siding with him in the event of a criminal prosecution. On the other hand, as he well knew, by cooperating with DHS he risked the possibility that his statements would be discovered by prosecutorial forces and used against him at a trial. If he did not cooperate with DHS, however, the risk of losing his children was presumably increased and the risk of criminal prosecution remained—without the benefit of significant DHS influence.

It was something of a dilemma to be sure, but it was a dilemma of his own causing. When people abuse children in this society, two distinct processes are triggered. One is the criminal process, which focuses on the proper way to deal with the perpetrator. The other is the child protective process, which focuses on the best interests of the child-victim. In appellant's case, both of these processes were well set in motion by the information initially reported to the authorities. Each of these processes was going to play itself out, one way or another, whether appellant wanted it and whether he took affirmative steps to affect the processes. In effect, Mrs. Cirks merely apprised appellant where he stood in the great flow of things, and, obviously in the best of faith, she offered him a very plausible scenario that might improve his personal and family prospects.

*Moreno,* 36 M.J. at 112.

If we substitute Special Agent Minnick for Mrs. Cirks in the above scenario, it bears a remarkable resemblance to what occurred in the appellant's circumstance. We are convinced that the special agent did not threaten to jail the appellant or his wife if a confession of the appellant's responsibility was not forthcoming. The agent did not threaten that the appellant's unborn child would be taken away if he did not confess. The agent did not promise counseling if the appellant confessed. As the appellant and Special Agent Minnick testified, at most, Special Agent Minnick brought up the possibility of counseling instead of courts-martial, and the appellant understood that a confession would show remorse and the agent would "tell my command that counseling is what [Minnick] recommended because I was so honest with him." Record at 32, 40. In fact, the agent was very honest. The appellant testified he was told by the agent that the options for the command were "counseling and there was also court-martial." Record at 43. Were we to overrule the military judge, we would be required to find that an agent's honest assessment of both parents' possible culpability in a child-abuse case, without threat of unlawful action, is a basis for suppressing an otherwise voluntary confession. Both *Bubonics* and *Moreno* guide us away from such a finding, and we decline to so rule.

Accordingly, the findings of guilty and the sentence, as approved on review below, are affirmed.

Judge LUCAS and Judge WYNNE concur.