# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, A.C. RUGH**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**RONALD A. LOVOS**
**CORPORAL (E-4), U.S. MARINE CORPS**

**NMCCA 201400102**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 6 November 2013.
**Military Judge:** LtCol Nicole Hudspeth, USMC.
**Convening Authority:** Commanding General, 2d Marine Logistics Group, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Capt M.D. Jefferson, USMC.
**For Appellant:** LT Jonathan Hawkins, JAGC, USN.
**For Appellee:** Maj Suzanne Dempsey, USMC; Capt Matthew Harris, USMC.

**18 August 2015**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.

KING, Judge

A general court-martial, consisting of members with enlisted representation, convicted the appellant, contrary to his pleas, of one specification of conspiracy to commit larceny, one specification of larceny by false pretenses, and one specification of violating Title 8 U.S.C. § 1325 by entering into a "sham" marriage to enable his spouse to obtain permanent

residence status, in violation of Articles 81, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 921, and 934. The members sentenced the appellant to reduction to pay-grade E-1, fifteen months' confinement, and a bad-conduct discharge. The convening authority approved the sentenced as adjudged.

The appellant raises several assignments of error, including that the military judge erred by: admitting the appellant's involuntary confession; denying the appellant expert assistance regarding coerced confessions; and admitting human lie detector testimony. However, the assigned errors are rendered moot as we hold the evidence is factually insufficient to sustain the appellant's conviction. Art. 66(c), UCMJ.

## Background

The appellant is a Salvadoran national who came to the United States when he was thirteen years old. Prior to arriving in the United States, the appellant did not speak English. Joining the Marine Corps four years after his arrival in the United States, the appellant subsequently graduated from Recruit Training and Motor Transportation Mechanic School. In April of 2010, the appellant joined his unit as a private first class.

The appellant's fire team leader was Lance Corporal (LCpl) Addae-Mensah (Mensah), a Marine from Ghana 13 years older than the appellant. Although the appellant had difficulty at that time getting along with his fellow Marines, LCpl Mensah immediately became the appellant's "mentor" who the appellant credited with "looking out for me, you know, in my first days at the fleet."[1] The appellant would even spend his weekends at LCpl Mensah's house, and it was on one of these weekends, three or four weeks after he arrived at the command, that the appellant met LCpl Mensah's cousin, Georgia Mensah (Georgia). Georgia was also from Ghana and in the United States legally attending school in the Maryland area. Approximately five months later, the appellant and Georgia married. Over two years later, LCpl Mensah came under suspicion for facilitating "contract" or "sham" marriages. Law enforcement agents therefore turned their attention to the appellant's marriage to Georgia and the appellant was subsequently tried and convicted of three offenses

---

[1] Record at 374.

2

related to this marriage.[2]  Additional facts necessary for the resolution of the appellant's case are included below.

## Discussion

The appellant was charged with three offenses stemming from what the Government alleged was a "sham" marriage.  Conviction on each of the three offenses depended upon the Government proving, beyond a reasonable doubt, that the appellant's marriage to Georgia was a "sham."  On this issue, the members heard the testimony of the appellant and evidence regarding the appellant's statement to law enforcement.  A detailed recitation of each is required for a thorough analysis of the issue.

## Testimony of the Appellant

We begin by noting the record indicates that, as a second language, the appellant clearly had not mastered English.  The appellant described his fluency as follows: "[m]y writing is decent; my talking is not so well.  I understand and its okay. . . . . I can understand basically.  Not all of it, there's a lot of words that are kind of complicated to me . . . I get drawed [sic in original] up in conversation and then, you know, people say something else and then I just get confused."[3]

About four weeks after joining his unit, the appellant went to a party at LCpl Mensah's home where he met Georgia.  The appellant also testified that although Georgia was eight years older than he, she was "cute" and seemed "really interested."[4]

---

[2] Charge I:  In that [the appellant] . . . did . . . on or about 26 October 2010, conspire with [Cpl Mensah] and [Georgia] to commit an offense under the [UCMJ], to wit: larceny of Basic Allowance for Housing, the property of the United States, and in order to effect the object of the conspiracy the [appellant] did enter into a marriage with [Georgia].

Charge II:  In that [the appellant] . . . did . . . between on or about 26 October 2010 and 1 September 2012, steal by false pretenses U.S. currency of a value of more than $500.00, property of the U.S. government.

Charge III:  In that [the appellant] . . . did . . . on or about 26 October 2010, wrongfully commit marriage fraud by entering into a sham marriage with [Georgia], a foreign national and citizen of Ghana, for the purpose of obtaining permanent resident status for the said [Georgia], in violation of title 8 U.S.C. § 1325, which conduct was of a nature to bring discredit upon the armed forces.

[3] Record at 35.

[4] *Id*. at 376.

In fact, the appellant testified that "[w]hen I first met her, I was like, you know, she's amazing, you know, I want to be with her, you know. At that time, all I wanted to do the first day was, you know, have sex with her. That was the first thing back then."[5] The appellant obtained Georgia's phone number and, although Georgia returned to Maryland, the appellant spent the following days "flirting" with her via telephone calls and texts.[6]

Two weeks later, Georgia returned to LCpl Mensah's apartment where the appellant went to see her. According to the appellant, the two spent time getting to know each other which blossomed into a typical modern-day military courtship. After the weekend, Georgia returned to Maryland.

On her third visit, in July 2010, the appellant testified that the courtship intensified and the relationship turned intimate, the circumstances of which the appellant testified to in detail. At this point, the appellant testified that he had fallen in love with Georgia. After spending a few nights with the appellant, Georgia returned to Maryland.

In September 2010, Georgia made her fourth visit to LCpl Mensah's home. During this visit, the appellant testified about how he purchased an $800.00 ring and proposed to Georgia. The appellant testified at length to the range of raw emotion he felt as he decided upon and executed his marriage proposal: "I'm feeling really excited but at the same time I'm feeling kind of like what's going to happen, you know, I didn't really know, like, the steps . . . she's going to be away and, you know, it's probably going to be weird at first, you know, I got to, you know, behave, you know, with her."[7] After the two discussed the difficulties of a new military marriage, Georgia accepted. The two were wed five weeks later, on 26 October 2010, in the local courthouse with ten friends in attendance, including Cpl Mensah. The appellant described in detail what he and Georgia were wearing and the defense introduced a picture of the couple after they said their vows.[8] The appellant and his wife spent the next three days together and then Georgia returned to Maryland.

---

[5] *Id.*

[6] *Id.*

[7] *Id.* at 385.

[8] Defense Exhibit H.

4

The following December or January, the appellant testified that he and his wife drove to New York City, explored the city, and drove back to Jacksonville.[9]  Shortly thereafter, Georgia returned to school in Maryland.  In January 2011, over 90 days after becoming eligible, the appellant applied for BAH.  In addition, he granted Georgia a General Power of Attorney.[10]  The appellant testified that he also gave his wife cash as needed.  The appellant also filed a joint income tax return with his wife.[11]  In addition, the appellant testified that he purchased his wife gifts, including a dress, some lingerie, and other intimate items.  Similarly, Georgia purchased gifts for him, including a rice cooker, lotions, and cologne.

In April of 2011, seven months after they were married, the appellant deployed to Afghanistan.  According to the appellant, to this point in time, he and Georgia were happy and content in their new marriage.  However, once deployed, the daily contact dwindled and the appellant testified that his marriage changed:

> While I deployed, everything started changing, sir, due to the fact that I had given her power of attorney and she started asking me for more papers related to me like IRS taxes back from, like, 2010, 2009; information that I didn't really want to, like, you know, give to her, but I already given the power of attorney because, you know, I was like, you don't need nothing [sic in original] else, I mean, why else would you need this.  She's, like, you know, we need to get this started.  I was, like  -- because she was trying to get her [immigration] paperwork started so by the time I came back, she, you know, we were going to be able to go up to Raleigh and pretty much apply for her green card.[12]

Georgia persisted in her requests and the appellant became "annoyed:"

---

[9] This testimony is supported by Prosecution Exhibit 4, the appellant's bank records for that period of time, which indicate the appellant was in New York in January 2011.

[10] DE A.

[11] DE E.

[12] Record at 395.

[W]hy can't we just wait[?]  So I was feeling like I was being, like, annoyed to a point with her because she started changing the fact that she was being all nice to me and telling me all these good things about, you know, I love you, you know, babe, boo, you know, all these nice things.  And then all she wanted to do was get, you know, information from me.  . . . I was getting really annoyed and upset, sir, at the fact that she was always proceeded [sic in original] and pushing it through."[13]

The appellant testified that during the deployment, Georgia "wasn't being as nice to me anymore" and the marriage deteriorated.[14]  Georgia's insistence that the appellant help her get her green card persisted throughout the deployment and the appellant eventually relented and provided Georgia some of the information she needed to "begin the process."[15]

When he returned in October 2011, the appellant and Georgia signed a lease for an apartment in Jacksonville, North Carolina and the appellant purchased items needed to live in the apartment.[16]  Georgia was still returning to Maryland to attend school, but had several personal items in the apartment and stayed there when she returned to Jacksonville.  At this time, the appellant added Georgia as a joint owner to his bank account and obtained a bank card for Georgia that was tied to that bank account.[17]  The marriage, however, continued to deteriorate.

In February 2012, the appellant sponsored Georgia for immigration purposes and, after receiving permission from his command, drove her to Raleigh, North Carolina for her interview. During the trip, Georgia was "really sweet" to the appellant: "[s]he started, like, holding my hand and telling me when are you getting out of the Marine Corps, you know, what we are going to do when we get together, don't worry, you know, I'm

---

[13] *Id.* at 396

[14] *Id.* at 404.

[15] *Id.* at 397.

[16] DE C; Record at 406.

[17] Record at 394.  This testimony is supported by PE 4, the appellant's bank records, which list Georgia as a "Joint Owner" on the appellant's bank account beginning January 2012.

eventually, you know, we got to stick together."[18]  At the close
of the interview, the appellant called his command and received
permission to spend the rest of the day with his wife.  A few
days later, Georgia returned to Maryland.

In June of 2012, the marriage was "[n]ot going so well."[19]
The appellant questioned Georgia about when she was going to
finally move to Jacksonville and Georgia replied "just a few
more weeks."[20]  However, in August of 2012, Marine law
enforcement agents contacted the appellant for the charges now
at issue.  He was then interviewed at the Criminal Investigation
Division (CID) by Sergeant (Sgt) Tran and Agent Wilhelm.
Although the appellant wanted to see his wife, once his
interrogation was complete, Sgt Tran instructed the appellant to
"don't ever talk to [Georgia] again," and the appellant
complied.[21]

The Government offered the appellant's Servicemembers Group
Life Insurance Election and Certificate, signed on 24 January
2011, which designated his parents as his beneficiaries.[22]  In
addition, during cross-examination, the appellant admitted that
his own immigration paperwork erroneously indicated that the
appellant was not married.[23]  However, the appellant explained
that he began his immigration paperwork--and thus checked the
block that denoted he was not married--before he and Georgia
were married.  By the time Base Legal called him in to sign his
package several weeks later, he had married Georgia.

The appellant also testified that, at the time he married
Georgia, his own citizenship hinged upon his receiving an
Honorable discharge from the military.  In response to the
members' questions, the appellant testified that he had received
no pressure to marry Georgia; that Georgia's citizenship became

---

[18] *Id*. at 408.

[19] *Id.* at 411.

[20] *Id.* at 412.

[21] *Id.* at 416-17.  The appellant testified at trial that, per Sgt Tran's
instructions, he had not seen nor spoken to Georgia as of 06 November 2013.
In January 2014, the appellant looked up information online regarding
divorce, but had not taken any steps to divorce Georgia because he wanted to
"see how this thing [trial] goes."  *Id.* at 417.

[22] PE 6 at 7.

[23] PE 7 at 3.

the "priority of this relationship" just before he deployed; and that prior to that point, Georgia's citizenship "never came up."[24]

### The Appellant's Statement to Law Enforcement

Prior to trial, the Government sought to admit PE 1, a statement signed by the appellant wherein he confesses to entering into a sham marriage. At the pretrial hearing, the Government called Sgt Tran, who testified substantially as follows:

Sgt Tran became an accredited Marine criminal investigator on 20 October 2011. On 23 August 2012, she contacted the appellant's command and asked that he be escorted down to the CID building. The appellant arrived at 0955 and she started by informing the appellant that he was suspected of frauds against the United States. She then read him his rights verbatim. The appellant indicated that he understood his rights. Based upon the appellant's interaction with her, she had no doubt that the appellant understood his rights.[25] Sgt Tran testified that she took notes as the appellant answered her questions but also testified that she typed the appellant's answers as he provided them. In the room with her was Agent Wilhelm, a retired Marine who was now a civilian CID agent. Once she finished typing the statement, she asked the appellant to read through it and initial each paragraph. At the end, she swore the appellant to the truth of his statement and he signed it. On cross examination, Sgt Tran testified that she was not aware that English was the appellant's second language, but that she had to explain the meaning of one word to him.[26]

The appellant testified on the Government motion to admit PE 1 substantially as follows: When he arrived at CID, it was just he and Sgt Tran in the room. They entered a small room with a table and chairs. Sgt Tran told him that he was being investigated for marriage fraud and that there were several people on base "getting contract marriages and stuff. And that [Cpl Mensah] was being investigated and stuff for setting these things up."[27] The appellant didn't understand all of his rights

---

[24] Record at 436.

[25] *Id.* at 14.

[26] *Id.* at 10-25.

[27] *Id.* at 28.

and didn't know that he needed a lawyer because "I didn't think that was like a big deal. Just that, you know, this never happened to me before."[28] Moreover, the appellant testified to his difficulty with English. At the interrogation, the appellant denied his marriage was a sham and attempted to provide Sgt Tran much of the information detailed above.[29]

Agent Wilhelm then entered the room, sat next to the appellant, and started smoking an e-cigarette. As the appellant attempted to answer Sgt Tran's questions, Agent Wilhelm continuously interrupted him claiming "that's not true, that doesn't make sense what [sic] I'm answering."[30] Agent Wilhelm did not "look calm" and stood up "right next" to the appellant and raised his voice while accusing the appellant of lying.[31] The appellant continued to attempt to explain his marriage was legitimate "[b]ut then, you know, every time I try to say something, he will try to contradict me and say something else."[32] The appellant became "scared" because "I was there and didn't know what was going to happen after that. And I was being investigated. And the whole process of it I didn't know what was going to happen with me. I was planning to reenlist. And that moment everything – my whole life just turned in half and I got really scared."[33] Agent Wilhelm told the appellant that Basic Allowance for Housing (BAH) was "what [he] needed, you know, that's what you wanted. That's when I, you know, started crying and the whole thing." After that, the appellant started to "break down and . . . getting migraines."[34] At this point, the appellant felt "coerced into saying certain things about the marriage[,]" and Sgt Tran told the appellant that "since I'm cooperating, the most I can get is a battalion level NJP. And she was going to, you know, be a witness for me, if anything, and that I was being a good guy by, you know, talking to her and stuff."[35] The appellant testified once he had been informed that there was a "whole circle of people marrying

---

[28] *Id.*

[29] *Id.* at 26-40.

[30] *Id.* at 30.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 32.

[34] *Id.*

[35] *Id.*

people from Ghana," that he felt like he "messed up" and may have entered into a contract marriage.[36] However, he did not know of this information before the interview and did not believe he had entered into a contract marriage prior to the interview.

The appellant also testified that he did not understand some of the terms used by Sgt Tran in the statement. When reviewing the statement, the appellant "had a headache. I had just finished up, you know, crying and stuff, and I just- – really wanted to get out of that room. And that was my whole thing. I was really not expecting nothing really crazy."[37] As a result, the appellant didn't read through the statement, but instead "just broke down and just wanted to breathe some air, get out of there."[38] During the over two hour interview, the appellant was never offered a break. Finally, the appellant testified that the statement was not accurate and was more of what Agent Wilhelm wanted him to say.

On redirect, Sgt Tran admitted that Agent Wilhelm was smoking and could not recall if the appellant was ever offered a break once the interview began. In addition, she testified that the appellant consistently maintained that his marriage to Georgia was not a contract marriage intended to defraud the Government. However, after Agent Wilhelm "put his hand on [the appellant's] shoulder" and accused him of lying, the appellant finally stated "All right, I'll tell you the truth; yes, yes, I am."[39]

PE 1 details that LCpl Mensah encouraged the appellant to marry Georgia to "help her out to get citizenship," and that the appellant would then receive BAH.[40] The appellant resisted, but eventually relented and agreed to "marry her and put in the paperwork before I deployed in 2011; however, once I returned we would divorce."[41] According to PE 1, the next time the appellant saw Georgia was in January 2011 when she "came down to get an

---

[36] *Id.* at 33.

[37] *Id.* at 34.

[38] *Id.* at 39.

[39] *Id.* at 42.

[40] The Government offered no evidence that the appellant conspired with Georgia to steal BAH.

[41] PE 1 at 2.

10

Identification card from DEERS."[42]  Moreover, PE 1 states that "[s]ince we have been married we have never had sex, and I do not consider [Georgia] to be a friend of mine."[43]

After hearing argument on the motion, and without providing any findings of fact or conclusions of law, the military judge stated simply: "Okay.  The defense motion to suppress the confession is denied.  The government motion to admit the confession is granted."[44]

At trial, Sgt Tran admitted that, during the interview, she and Agent Wilhelm interrupted the appellant because the appellant was "giving less than truthful answers."[45]  Sgt Tran admitted that the appellant told her repeatedly that he loved Georgia, but that Sgt Tran and Agent Wilhelm continued to tell the appellant "[w]e don't want to hear a lie."[46]  In addition, the defense established that the appellant provided Sgt Tran essentially the same information as he provided the members when he testified (e.g., the fact that the appellant and Georgia had exchanged gifts, that the appellant had taken Georgia on dates and to dinner on several occasions, and the appellant's recitation of his proposal to Georgia).

Although Sgt Tran claimed that the statement contained the words of the appellant, she admitted that she typed the statement and that she had to explain one of the words in the statement to the appellant.[47]  Further, Sgt Tran admitted that she essentially conducted no further investigation into the accusations against the appellant other than to obtain DEERS and TRICARE documentation.  Sgt Tran was unaware that the appellant had provided a General Power of Attorney for his wife, that the appellant and Georgia had signed a lease together, or that Georgia was a joint account owner of the appellant's bank account.  Moreover, Sgt Tran failed to interview Georgia[48] and

---

[42] *Id.* at 3.

[43] *Id.*

[44] Record at 47.

[45] *Id.* at 314.

[46] *Id.* at 315.

[47] *Id.* at 323.

[48] The record indicates that this was perhaps due to an ongoing investigation and a fear that other subjects would become aware of the investigation and flee.

failed to obtain the appellant's phone records.  All of this because, "[w]e had already had a statement and [at] that point, we had already had the marriage certificate and all the information from the [Installation Personnel Administration Center]."[49]

Moreover, Sgt Tran explained: "Five to seven minutes [into the interrogation] we realized that he wasn't being as truthful as we would've hoped he would have initially been.  At that point, that is when Investigator Wilhelm asked him a direct question: Was he involved in a contract marriage?  He said no and that's when they went back and forth asking the same question in order for Lovos -- Corporal Lovos to understand that we were not just going to go away.  We knew what was going on and it was time for him to be truthful about what was happening."[50]  The interrogation was not recorded.

At trial, the appellant repeated for the members much of what he testified to during the pretrial hearing.  In addition, the appellant informed the members that Agent Wilhelm:

> kept on cutting me off every time I tried to answer something, he always cut me off and he's like, you know, all that doesn't make sense, you know we got, you know, these things going on against you and so on, and so on; pretty much trying to make me feel guilty or try to make me look like an idiot.  Even though I was trying to say something, I say it like five times. And they kept saying no; both of them, like, it doesn't make sense, like, almost trying to make me put words in this little thing that had happened.[51]

When asked how this made him feel, the appellant responded:

> I was feeling really bad, sir.  I ended up getting a migraine.  I even cry.  . . . Agent Wilhelm, he ended up putting his hand on me.  And he was not just, handling that, he, like, hold me tight, and then he, like, slammed me in the back of the -- you know what,

---

[49] Record at 337.

[50] *Id.*

[51] *Id.* at 413.

that doesn't make sense, you know, trying to be, like, that.[52]

When asked why he signed the statement if it was inaccurate, the appellant replied:

The fact that I didn't read through like I was supposed to. I just wanted to get out of the way and I trusted Agent Tran with everything, with the whole conversation that we were having. I trusted her so I was not expecting this to get out of hand. Plus, the promises that agent Tran said . . . [that] if anything happens, you know, you're probably just going to get a battalion level NJP if they find you, you know, guilty of all this stuff, you know, don't worry about it, and so on."[53]

The first time the appellant contemplated divorce was when he was in the interview room after "[t]hey pretty much say I have a contract marriage," which caused the appellant to "feel guilty, like I really, you know, messed up."[54]

The Government also offered uncontested evidence that the appellant had married Georgia and that he was receiving BAH. Neither Cpl Mensah nor Georgia testified.[55] In addition to the appellant, the defense called Chief Warrant Officer 3 (CWO3) Blanton, who supervised the appellant for seven months prior to deployment and the six months on deployment. CWO3 Blanton opined that the appellant was a good Marine, an "honorable man," a "truthful person," a "law-abiding citizen," and when asked whether the appellant was a leader or a follower, CWO3 replied "certainly a follower."[56]

---

[52] *Id.*

[53] *Id.* at 414-15.

[54] *Id.* at 416.

[55] Cpl Mensah received Article 15 punishment for conspiring to "arrange fraudulent marriages" and was separated from the Marine Corps with an Honorable discharge. Encl 10 to Clemency letter dtd 24 Feb 14; DD Form 214 attached to Appellant's Motion to Attach dtd 2 Jun 2015.

[56] Record at 367.

## Factual Sufficiency

Under Article 66(c), UCMJ, we must conduct a *de novo* review of factual sufficiency of each case before us. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make . . . [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

We are convinced that the Government offered sufficient proof that the appellant was married to Georgia and that he received BAH as a result. The focus of our analysis is whether we are convinced beyond a reasonable doubt that the appellant knowingly entered into a "sham" marriage with Georgia. If not, the appellant cannot be guilty of any of the offenses charged.[57] To prove this element, the Government relied almost exclusively upon PE 1.[58] However, we find ample evidence in the record to raise reasonable doubt.

First, we note that the appellant gave Georgia a General Power of Attorney and total access to his bank accounts. PE 1 paints a picture of a Marine who wanted nothing to do with Georgia, only reluctantly agreed to a contract marriage with her, and then only after insisting upon divorcing her when he returned from deployment. It is difficult to imagine that such a Marine would marry a woman he neither knew well nor liked, and then grant that near-stranger absolute control over his legal

---

[57] Charges I and II required the Government to prove that the appellant intended to obtain the BAH with a "criminal false pretense," which the military judge instructed the members was "any misrepresentation of fact by a person who knows it to be untrue which is intended to deceive which does, in fact, deceive." *Id*. at 443. Charge III required the government to prove that the appellant "wrongfully and knowingly married [Georgia] for the purpose of evading immigration laws." *Id.* at 444.

[58] When walking the members through the charges during closing argument, the trial counsel focused on PE 1, stating, "[o]nce again, this is all in his confession." *Id.* at 456.

14

affairs while he deployed to Afghanistan and then absolute access to his bank account.

Second, and as mentioned, PE 1 states that the appellant's intention was to divorce Georgia as soon as he returned from deployment.  Yet, when he was interrogated nearly two years later, he was not only still married to her, he had leased an apartment with her, filed a joint income tax return with her, provided her funds for medical appointments, and ensured that Georgia was enrolled in TRICARE.

Third, the appellant's bank records disclose that the appellant was financially in good health when he married Georgia.  There is no indication that he had insufficient funds or had ever overdrawn his account.  Moreover, when asked what he did with the BAH he received, the appellant replied "It's stayed in the bank."[59]  At the time he was interrogated, the appellant had several thousand dollars in his bank account, lending credence to the appellant's response.[60]  While certainly not dispositive, we nonetheless discern no specific motive for the appellant to steal money by engaging in a sham marriage.

Fourth, the appellant had a great disincentive for engaging in such a reckless scheme, testifying that if he did not receive an Honorable discharge, he would imperil his own U.S. naturalization process and face deportation.

Fifth, although our holding does not require that we resolve whether or not the appellant's "confession" was the "product of an essentially free and unconstrained choice by its maker[,]" *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996), we have grave misgivings about PE 1.  Sgt Tran admits that the appellant started out providing much of the same information he did at trial and evidence existed to prove much of what he was saying.  However, Sgt Tran and Agent Wilhelm, convinced of the appellant's guilt, declined to verify any part of the appellant's story and instead, verbally and physically beset the appellant until the appellant finally "broke down." The statement that Sgt Tran then produced -- containing at least one word the appellant didn't even understand -- is rife with implications that are demonstrably false.

---

[59] PE 1 at 3.

[60] PE 4 at 110 and 118.

## Conclusion

For these reasons, we are not convinced beyond a reasonable doubt that the appellant intended to obtain BAH through deception or wrongfully and knowingly married Georgia for the purpose of evading immigration laws, we therefore find the evidence factually insufficient to support the appellant's Convictions and set aside the findings and the sentence. Art 66(c). The charges are dismissed with prejudice.

Senior Judge FISCHER and Judge RUGH concur.

For the Court

R.H. TROIDL
Clerk of Court

16