# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, PENLAND, and COOPER
Appellate Military Judges

**UNITED STATES, Appellant**
v.
**Specialist NICHOLAS B. LOWERY**
**United States Army, Appellee**

ARMY MISC 20240300

Headquarters, 1st Cavalry Division
Joseph K. Venghaus, Military Judge
Lieutenant Colonel Allison D. McFeatters, Staff Judge Advocate

For Appellant: Captain Patrick S. Barr, JA; Major Timothy R. Emmons, JA (on brief and reply brief).

For Appellee: Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA; Captain Amber L. Bunch, JA (on brief).

18 December 2024

-------------------------------------------------------------------------
MEMORANDUM OPINION AND ACTION ON APPEAL
BY THE UNITED STATES FILED PURSUANT TO
ARTICLE 62, UNIFORM CODE OF MILITARY JUSTICE
-------------------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Senior Judge:

We determine the military judge erred by suppressing statements appellee made to Special Agents (SAs) from the Army Criminal Investigation Division (CID).

Appellee is on trial for one specification of murder and two specifications of obstructing justice, in violation of Articles 118 and 131b, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 931b [UCMJ]. The government timely filed an appeal under Article 62, UCMJ, alleging the military judge erred by suppressing appellee's statements.

This case arises from the death of Sergeant (SGT) ██. Sergeant ██ died early in the morning between approximately 0740 and 0806 hours, after being shot in

the head with a handgun while at appellee's home. Appellee, appellee's wife, and Specialist (SPC) ██ were at appellee's home when SGT ██ died. During the previous evening into the early morning hours, appellee, SGT ██, and SPC ██ drank alcohol until all were intoxicated.

On the same morning of SGT ██'s death, appellee and SPC ██ told CID SAs that SGT ██ committed suicide by shooting himself. Neither soldier was suspected of a crime or advised of their Article 31(b), UCMJ rights by CID SAs that morning. Over the ensuing days, CID SAs investigated SGT ██'s death. Based on collecting and analyzing evidence, CID SAs began to question whether SGT ██'s death was a suicide and requested an additional interview with appellee. At this second interview [hereinafter the interview], approximately ten days later, appellee was suspected of a crime, advised of his Article 31(b), UCMJ rights by a CID SA, and made statements that are now the subject of this government appeal.

## LAW AND DISCUSSION

Article 62, UCMJ, in pertinent part, allows the United States to appeal an interlocutory ruling excluding evidence that is substantial proof of a material fact.[1] "In a trial by general or special court-martial or in a pretrial proceeding under section 830a of this title (article 30a), the United States may appeal the following: . . . an order or ruling which excludes evidence that is substantial proof of a material fact." Article 62(a)(1)(B), UCMJ. Our superior court comprehensively addressed this threshold question in *United States v. Jacobsen*, 77 M.J. 81 (C.A.A.F. 2017), guiding us to consider both whether the disputed ruling excludes evidence, and, if so, whether the excluded evidence is substantial proof of a material fact. Beyond the required government certification on this point, this court must independently consider the issue. As with all jurisdiction questions, we decide this de novo. *Id.* at 84 (citing *United States v. Vargas*, 74 M.J. 1, 5 (C.A.A.F. 2014)).

In this case, appellee does not contest our jurisdiction. We then need only determine if a reasonable fact finder could deem appellee's suppressed statements as substantial proof of a material fact; the answer is yes. After determining jurisdiction exists, we now turn to whether the military judge's evidentiary ruling was an abuse of discretion. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citing *United States v. Monroe*, 52 M.J. 326, 330 (C.A.A.F. 2000)).

"In an Article 62 appeal, this Court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the party which prevailed at trial." *United States v. Henry*, 81 M.J. 91, 95 (C.A.A.F. 2021) (quoting

---

[1] *See generally United States v. Wuterich*, 67 M.J. 63, (C.A.A.F. 2008); *United States v. Lopez de Victoria*, 66 M.J. 67 (C.A.A.F. 2008); *United States v. Browers*, 20 M.J. 356 (C.M.A. 1985).

*United States v. Lewis*, 78 M.J. 447, 452 (C.A.A.F. 2019)). A military judge abuses their discretion when their findings of fact are clearly erroneous, their decision is influenced by an erroneous view of the law, or their decision is outside the range of reasonable choices arising from applicable facts and the law. *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019), *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013). This court is "bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous." *United States v. Becker*, 81 M.J. 483, 489 (C.A.A.F. 2021) (quoting *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017)). A finding of fact is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Frost*, 79 M.J. at 110 (quoting *United States v. Martin*, 56 M.J. 97, 106 (C.A.A.F. 2001)). Under Article 62, UCMJ, "[a] reviewing court may not 'find its own facts or substitute its own interpretation of the facts.'" *Becker*, 81 M.J. at 489 (citing *United States v. Cossio*, 64 M.J. 254, 356 (C.A.A.F. 2007)).

The abuse of discretion standard is deferential. *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (citing *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)). Mere disagreement with a trial judge's evidentiary ruling is not enough to reverse; instead, this court may reverse only where the decision is clearly out of bounds under the facts and applicable law. *Id.* Our level of deference depends on the degree to which military judges explain their analysis on the record. *United States v. Finch*, 79 M.J. 389, 397 (C.A.A.F. 2020) (citing *United States v. Benton*, 54 M.J. 717, 725 (Army Ct. Crim. App. 2001)).

The military judge suppressed appellee's statements on two grounds: (1) appellee's rights advisal under Article 31(b), UCMJ was defective; and (2) his statements were involuntarily made as his "will ha[d] been overborne."[2] We discuss each of these grounds below.

### A. Article 31 Rights

As to determining appellee's rights advisal was defective, after our review of the military judge's ruling, we determine his findings of fact, and the conclusions derived therefrom, are not fairly supported by the record. We have, under the limits

---

[2] The military judge suppressed appellee's statements pursuant to Military Rules of Evidence [Mil. R. Evid.] 304 and 305. "A statement obtained in violation of the accused's rights under Article 31 is involuntary and is inadmissible" in the government case-in-chief. *See* Mil. R. Evid. 305(c)(1). "A statement obtained in violation of Article 31 . . . may only be used to impeach by contradiction the in-court testimony of the accused or in a later prosecution against the accused for perjury, false swearing, or the making of a false official statement." An involuntary statement obtained "through the use of coercion, unlawful influence, or unlawful inducement" is inadmissible. *See generally* Mil. R. Evid. 304(a).

of our Article 62, UCMJ, review, a "definite and firm conviction" that they were erroneous. *Frost*, 79 M.J. at 110.

At the start of the interview, the CID SA advised appellee he was suspected of committing the offenses of manslaughter and obstruction of justice in relation to SGT █'s death. In the factual findings section of the ruling, the military judge found the SA suspected appellee "had committed the offense of murder" when the SA advised appellee of his Article 31(b), UCMJ, rights. This is a conclusion (not a fact) and it is not fairly supported by the record.

This faulty conclusion is then utilized by the military judge to conclude the SA's decision to advise appellee of manslaughter "was a tactical deception intended to prevent SPC Lowery from realizing he was suspected of one of the most serious offenses under the UCMJ." The military judge reasoned "[w]hile [the SA] did not make it apparent early in the interview, it is clear" the SA suspected appellee of committing murder, as opposed to manslaughter, at the rights warning advisal, thereby rendering the rights advisal defective. How can something be not "apparent" yet "clear" at the same time?

In discussing this issue, we must briefly enumerate the different types of homicide offenses. An "intentional" killing of another could result in three possible offenses depending on the facts: (1) premeditated murder; (2) intentional murder without premeditation; and (3) voluntary manslaughter (an intentional killing of another committed in the heat of sudden passion caused by adequate provocation). *See* Article 118(b)(1)); Article 118(b)(2); and Article 119(b)(1).[3] On the other hand, involuntary manslaughter involves a death resulting from an accused's culpable negligence, a different *mens rea*. *See* (Article 119(b)(2)).[4]

---

[3] The *mens rea* required to establish the offense of premeditated murder is "the premeditated design to kill" which means "the formation of a specific intent to kill and consideration of the act intended to bring about death"; while for unpremeditated murder, it is that "the accused had the intent to kill or inflict great bodily harm." The *mens rea* required to establish the offense of voluntary manslaughter is "the unlawful killing of a human being, with an intent to kill or inflict great bodily harm in the heat of sudden passion caused by adequate provocation." *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judge's Benchbook, paras. 3a-42-1, 3a-42-2, and 3a-43-1 (23 July 2024) [Benchbook].

[4] The *mens rea* required for involuntary manslaughter is the unlawful killing of a human being constituting culpable negligence. "'Culpable negligence' is a degree of carelessness greater than simple negligence. 'Simple negligence' is the absence of due care." Benchbook para. 3a-43-2.

4

In his ruling, the military judge does not address which type of alleged "murder" (premediated or intentional without premeditation) the military judge determined the SA suspected appellee committed at the beginning of the interview.

As encompassed by the military judge's findings of fact, the overriding theme of the SA's questions and discussions with appellee at the beginning of the interview is the concept SGT ███ was shot "accidentally." Early in the interview (at approximately one hour and twenty minutes), appellee stated, "whoever did it, it was an accident." Then, almost three hours into the interview, the SA said, "Out there you brought up basically that if something happened it was an accident. That's what you said. I want to believe that...As of right now, I can't though. I need you to talk me through the 'what' then I can try and understand the 'why.'" Five minutes later, appellee stated, "I think – I was holding the gun and then I shot him."

Following appellee's statement, the SA addresses a possible murder for the first time, as he explains to appellee the potential offenses based on his admission: "That's either you guys invited him over there for the sole purpose and you planned for this to happen. Or something else. You've got to help me understand where in this, this situation falls."

From this point forward, following appellee's admission, the military judge cites to multiple times where the SA explores the concept that appellee "intentionally" shot SGT ███. When the military judge provides contextual details to this concept, they relate to the possible *provocation* that led appellee to intentionally kill SGT ███ (a voluntary manslaughter offense). The military judge references in his analysis section, approximately seven hours into the interview, the SA alluding to the offense of voluntary manslaughter, as opposed to intentional murder without premeditation, by the SA beginning to ask appellee whether he shot SGT ███ in the "'heat of sudden passion caused by adequate provocation.'" The military judge then quotes the SA's exact words to appellee as follows "[y]ou may not have invited [SGT ███ over there for the purpose of trying to kill him . . . but ... I 100 percent believe, dude, that a s****y night/morning happened [sic] and [SGT ███] pushed you over the edge."

From the military judge's lengthy findings of fact, we discern only two very brief discussions of any "intent to kill," referencing a heightened *mens rea* of an actual "design or plan" to kill that would support only a murder offense (ie: premeditated murder).[5] The first time premeditated murder arises in the interview

---

[5] A reference to appellee having a plan (premeditated murder) occurs approximately three hours into the interview when the SA states to appellee "either you guys invited him over there for the sole purpose [of killing SGT ███ and you planned

(continued . . .)

occurs at approximately the three hour mark and it was triggered by appellee's admission that he shot SGT ▮▮▮ While mentioned by the SA, it is not further discussed. The second time occurs at the very end of the interview and it is discussed for approximately five minutes. When the military judge does not reconcile these limited references in relation to his multiple findings regarding the overriding theme of the interview exploring the concept of provocation, these two limited references do not fairly support his conclusion that the SA not only suspected appellee of "murder," as opposed to voluntary manslaughter, during the initial rights warning advisal, but the SA also intended to tactically deceive appellee.

In addition, the military judge's conclusion of law that advising appellee of manslaughter, instead of murder, rendered his rights warning waiver defective is clearly erroneous. "The purpose of informing a suspect of the nature of the accusation is to orient him to the transaction or incident in which he is allegedly involved." *United States v. Simpson*, 54 M.J. 281, 284 (C.A.A.F. 2000) (citing *United States v. Rice*, 11 U.S.C.M.A. 524, 526, 29 C.M.R. 340, 342 (1960)). "The precision and expertise of an attorney in informing an accused of the nature of the accusation under Article 31 is not required." *Id.* "It is not necessary that an accused or suspect be advised of each and every possible charge under investigation, nor that the advice include the most serious or any lesser-included charges being investigated. Nevertheless, the accused or suspect must be informed of the *general* nature of the allegation, to include the area of suspicion that focuses the person toward the circumstances surrounding the event." (emphasis added). *Id.* (citing *United States v. Huelsman*, 27 M.J. 511, 513 (ACMR 1988)).

In *Simpson*, the agent warned appellant he was suspected of indecent acts or liberties with the victim, not indecent acts and sodomy. *Id.* The court held these were sufficiently related and oriented appellant to the nature of the accusations against him. *Id.* Appellee was oriented at the beginning of the interview to the SA's accusation that appellee was suspected of manslaughter, which is sufficiently related

---

(. . . continued)
this to happen. Or something else." This is paragraph 36 of the military judge's ruling. It is not until approximately seven hours later that another reference to premeditated murder occurs in the interview as outlined by the military judge's factual findings (paragraphs 73, 74, and 75). This discussion occurs at the very end of the interview (approximately 10 hours and 15 minutes) and starts with the SA stating to appellee: "Did you plan to murder him before he came to the house? When [appellee] said 'no sir, [the SA] countered with

"I think you did." This concept that SGT ▮▮▮'s death was a planned murder is then discussed for approximately five minutes. At the end of this discussion, appellee denies he murdered SGT ▮▮▮ and the SA ceases any further questioning of appellee.

to murder. Such notification sufficiently focused appellee towards the area of suspicion and topic of discussion – that SGT ██'s death was not a suicide but instead a criminal act. Even in the middle of the interview, at approximately the five-hour mark, appellee states "I think I'm going to prison. Which I feel like, for manslaughter. I just think that's probably where I'm going to end up."

We now turn to the end of the military judge's ruling concluding the CID SA "took *direct* actions to ensure [appellee] did not fully understand that he was suspected of criminal misconduct." (emphasis added). The military judge's findings of fact and legal analysis do not fairly support this conclusion.

As part of his analysis, the military judge discussed a conversation between the SA and appellee at the beginning of his rights' advisement. The SA tells appellee because "someone died" that "I'm gonna [sic] have to advise you of your rights. So what you're going to see on the form is manslaughter and obstruction of justice. That doesn't necessarily mean that you've done those things but that just means that that is going to be the general topic of the questions you and I are going to talk about today." The SA then further states "if you put 100 people in this room over here, and something happened, each one of those people would have a different perception of what occurred, so your individual perception is important." Based on this language, the military judge ruled "[t]he bottom line is that [the SA] intended for this statement to inoculate [appellee] from the potentially chilling effect of the rights advisal and to make him erroneously believe that the rights advice was a mere formality read to all witnesses when 'someone died.'"

This analysis directly contrasts with the military judge's finding of fact that less than two minutes after this discussion, the SA handed appellee a paper entitled "Military Suspect's Acknowledgement and Waiver of Rights." The military judge found this form was not the standard Department of the Army Form 3881 [Right's Waiver Form] but it "contained [all] the warnings required by Article 31." The form stated appellee could terminate his "interview at any time, for any reason." The CID SA "read these warnings verbally while [appellee] followed along on his copy [of the form]." Afterwards, appellee also "read the waiver verbally" to the SA. The military judge found "[t]he form contained blocks to fill in information related to the location, date, name of the suspect, individual who is conducting the rights advisal, and what the person being interviewed is suspected of."

The military judge found the CID SA stated to appellee if "you're willing to answer some questions today about what happened, if you'll sign right there." The military judge never makes a declarative finding of fact that the next act was appellee placing his signature on the form. It can be clearly inferred from the fact section that appellee signed the form at that time because the military judge later states the SA "put the signed waiver document away."

There is no finding appellant expressed any interest or inclination to invoke his rights when he signed the form.[6] Beyond failing to directly acknowledge that appellee, by name, signed the form, as opposed to inferring his signature occurred by stating the SA "put the signed waiver document away," the military judge further omitted a key fact regarding appellee's willingness to waive his rights.

During our review of the video of appellee's interview, after appellee was advised of all his Article 31(b) rights on this different form, to include verbally reading the form, the CID SA asked appellee if he wanted to waive his rights and continue with the interview. Appellee confidently responds "absolutely." To be clear, as dictated by the limits of our Article 62, UCMJ, review, we have not adopted or inserted this omitted fact into our legal analysis. However, its omission by the miliary judge undermines the reliability and completeness of his analysis and diminishes our deference to his decision. *See United States v. Finch*, 79 M.J. 389, 397 (C.A.A.F. 2020) (holding the level of deference afforded a ruling depends on the degree to which the military judge reconciles competing facts and explains their analysis).

Even without the consideration of this omitted fact, we determine the military judge's legal analysis was based on clearly erroneous findings and conclusions. For this reason, we determine he abused his discretion in determining appellee's Article 31(b) rights warning was defective.

### B. Voluntariness

As to the military judge's determination appellee's will was overborne during the interview, we address, in pertinent part, Article 31(b), UCMJ, which states:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Article 31(b), UCMJ.

---

[6] The military judge recognized "[u]nlike the [standard] Department of Army Form 3881, the form [appellee] was given was constructed in a manner that the only way for [appellee] not to waive his rights would be to refuse to sign the form in his hand" and the form lacked an "option" to check to invoke his rights. The military judge did not explore why this difference was probative when his findings of fact did not include any indication that appellant expressed any desire to invoke his rights.

First, despite being a civilian employee, the CID SA was a person subject to the code for purposes of rights warnings. *See United States v. Jones*, 73 M.J. 357 n.3 (C.A.A.F. 2014); Mil. R. Evid. 305(b)(1). Military Rule of Evidence 304 states "...an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial except as provided" in limited situations. Mil. R. Evid. 304(a). The rule further states an "'involuntary statement' means a statement obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment of the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid 304(a)(1)(A).

In assessing voluntariness, a military judge must turn to the two-part test from *Schneckloth v. Bustamonte*, 412 U.S. 218, looking at both the personal characteristics of the accused and the circumstances of the interrogation. *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019). "The necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker." *Id.* (citing *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996)).

> 'In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.'

*Id.* (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (quoting *Schneckloth*, 412 U.S. at 226.)).

Here, the military judge, citing both *Freeman* and *Schneckloth*, determined there was no evidence to suggest appellee's personal characteristics caused his will to be overborne. As to this prong of the test, one of only two overarching prongs in determining the voluntariness of a statement, the military judge concluded "there is no evidence to suggest that [appellee's] interview was impacted by his age, education or intelligence."

Having solidified appellee's personal characteristics had no impact on the voluntariness of his statements, we now turn to the second prong of the analysis, the details of the interview, as did the military judge. As to this second prong, the military judge first referenced that the advice appellee received regarding his rights was "inadequate" and defective. As stated above, we have already determined the military judge erred in this legal conclusion.

Next, the military judge referenced the lengthy duration of the interview, over eleven hours, the few "actual breaks," the tactical questioning by the CID SA, and an uncomfortably hot room. The military judge next acknowledged the room's hotness was not a law enforcement tactic but an unfortunate circumstance of the building in which the interview was being conducted.

The military judge concludes, without explanation, how these factors, in the absence of any contrary evidence regarding appellee's personal characteristics, made it "clear" his statement was not voluntary. There is no analysis or probative weight assigned as to "why" the length of the interview, the few "actual breaks," the room temperature, or the tactical questions overwhelmed appellee's will when, in essence, the military judge ruled in favor of the government on the first prong of the totality of circumstances test. A totality of the circumstances test requires weighing all the factors against each other and the military judge's ruling lacks this balancing analysis.

In determining appellee's will was overborne, the military judge concludes "almost every fact that [appellee] ended up saying was first articulated by the SA ... [and] was adopted by [appellee]." This legal conclusion contrasts with the military judge's findings of fact that, at the end of the lengthy interview, when the SA finally confronts appellee with the assertion that SGT ███'s death was a premediated murder, appellee disagrees and states he did not murder SGT ███. This concept of a premeditated murder is then discussed for five minutes. Appellee consistently disagreed with the SA that a planned murder occurred. This consistent assertion by appellee that he did not murder SGT ███, despite the SA's assertion that appellee did, is fundamentally antithetical to finding an overborne will.

Our standard of review, as to the military judge's legal conclusion, is an abuse of discretion, which relies on the depth of the analysis from the military judge. Here, the military judge's analysis was lacking as to balancing the totality of the circumstances against each other, and therefore, warrants less deference. For the reasons articulated above, we find as a matter of law the military judge abused his discretion in determining appellee's will was overborne and his statements were not voluntary.

10

## CONCLUSION

The government appeal is GRANTED.

Judge PENLAND and Judge COOPER concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court